UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division

| | |
|---|---|
| In re:<br><br>    **Matthew Alan Jenkins,**<br>    **d/b/a Shephard Service Company,**<br><br>                                 **Debtor.** | **Case No. 12-50413**<br><br>**Chapter 7** |
| **James T. Ward, Sr., Trustee, and Linda**<br>**Simpson, United States Bankruptcy**<br>**Administrator,**<br><br>                          **Plaintiffs,**<br><br>**v.**<br><br>**Matthew Alan Jenkins,**<br><br>                          **Defendant.** | **Adversary Proceeding 12-3223** |

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiffs James T. Ward, trustee (the "Trustee") for Matthew Alan Jenkins (the "Debtor" or the "Defendant"), and Linda Simpson, the United States Bankruptcy Administrator (the "Bankruptcy Administrator"), hereby present this *Brief* in support of their Motion for Summary Judgment (the "Motion").

## I.    INTRODUCTION

The Bankruptcy Administrator and the Trustee brought this adversary proceeding (the "Adversary Proceeding") objecting to the Debtor's discharge based on his admissions as to transfers made within one year of filing his bankruptcy petition (the "Petition") and his refusal to heed the requirements of debtors in bankruptcy. In sum, the Motion should be granted because:

1)    The Debtor has admitted to transferring significant funds to his wife, Dianna Jenkins, within one year of his bankruptcy filing and after judgment had been entered against

him.

2)      The Debtor's bankruptcy papers are substantially incomplete and although amended multiple times, appear to have been filed with reckless disregard for the requirements of the United States Bankruptcy Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Official Bankruptcy Forms (the "Bankruptcy Forms").

3)      The Debtor has testified that he did not maintain records relevant to his assets, liabilities and financial condition, and he otherwise has refused to produce certain records to the Trustee.

## II.      JURISDICTION

The Court has jurisdiction to determine the Motion based on 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409(a) because this Adversary Proceeding arises under the Bankruptcy Code, or arises in or relates to a case pending pursuant to the Bankruptcy Code.

## III.      PROCEDURAL BACKGROUND

The Debtor filed his voluntary chapter 7 Petition on April 11, 2012 (the "Petition Date"), commencing the above-referenced bankruptcy case pending before the United States Bankruptcy Court for the Western District of North Carolina, Charlotte Division, Case No. 12-50413 (the "Bankruptcy Case").

On September 26, 2012, Plaintiffs brought a complaint objecting to the Debtor's discharge. (D.E. 1).  On October 19, 2012, the Debtor filed an answer to the Complaint (the "Answer"). (D.E. 4).

## IV.    STATEMENT OF UNCONTROVERTED FACT

A.    **The Debtor's Bankruptcy Filing Was Prompted by the Efforts of Federated Financial Corporation of America to Enforce a Judgment Against the Debtor.**

On March 16, 2010, Federated Financial Corporation of America ("Federated") was awarded a judgment against the Debtor (the "Federated Judgment") by the Wake County, North Carolina, Superior Court (the "State Court") in the case of *Federated Financial Corporation of America v. Matt Jenkins, individually and d/b/a Shephard Service Company*, Case No. 09-CVS-002084 (the "Federated Matter").   Exhibit A.   The Debtor subsequently filed two appeals as to the Federated Judgment, both of which were unsuccessful. *See Federated Fin. Corp. of Am. v. Jenkins*, __ N.C.App. __, 719 S.E.2d 48 (N.C.App. 2011) and *Federated Fin. Corp. of Am. v. Jenkins*, __ N.C.App. __, 721 S.E.2d 409 (N.C. App. 2012).

The day before the Petition was filed, on April 10, 2012, The Honorable Donald W. Stephens entered an *Order to Show Cause Why Matt Jenkins Should Not Be Held in Criminal Contempt of Court and Order Forbidding Transfer of Defendant's Property* ("Judge Stephens' Order") in the Federated Matter.   Exhibit B.   Judge Stephens' Order included a finding that the evidence submitted to the court indicated that the Debtor had received close to $400,000.00 in settlement proceeds from lawsuits that he had filed in North Carolina since 2008 (the "Lawsuit Proceeds").   *Id.* at 1.   That Order also finds that the Debtor "appears to deposit the [Lawsuit Proceeds] in his wife's bank account in order to avoid creditors[.]" *Id.* Judge Stephens' Order provided that the Debtor was not to "transfer any funds related to [the Lawsuit Proceeds] received by him and deposited in any bank account or located elsewhere[.]" *Id.* at 2.

The next day, on April 11, 2012, the Debtor filed his *pro se*, bare bones bankruptcy

Petition. Bankr. D.E. 1.[1] The only creditor listed on the Debtor's Petition was Federated at an unspecified amount. *See* Petition, Bankr. D.E. 1 at 9.

Following the Debtor's appearance at a hearing in the Federated Matter on April 12, 2012, the day after the Petition Date, Judge Stephens entered an order, attached as <u>Exhibit C</u>, finding that the Debtor was not in criminal contempt of court and acknowledging that the remaining provisions of Judge Stephens' Order were stayed by the Debtor's bankruptcy filing. Ex. C at 1-2.

**B.      The Debtor's Bankruptcy Papers Are Substantially Incomplete Despite Several Amendments.**

Within a week of the Petition Date, on April 17, 2012, the Debtor sent an email to the Court indicating that he had reconsidered his bankruptcy filing and decided to voluntarily dismiss his bankruptcy case. <u>Exhibit D</u>. On April 20, 2012, the Court entered an Order providing that the Debtor's case would not be dismissed for failure to file his bankruptcy schedules, statement of financial affairs ("SOFA") or any other required papers. Bankr. D.E. 27.[2]

On April 24, 2012, the Debtor filed his bankruptcy schedules and SOFA in the Bankruptcy Case (the "Bankruptcy Papers"). Bankr. D.E. 33. In the Bankruptcy Papers, the Debtor indicated that Federated holds a claim for $40,000.00. *Id.* at 13. The Debtor also scheduled claims for the Internal Revenue Service and the North Carolina Department of Revenue. *Id.* at 12. In his SOFA, the Debtor indicated that he had not received any income from employment in the two years preceding the Petition Date but that he had received $235,278.00 in "lawsuit proceed" [*sic*] within two years of his bankruptcy filing. *Id.* at 19-20.

---

[1]      Citations to "Bankr. D.E. __" refer to docket entries in the Bankruptcy Case.
[2]      The Debtor had filed a petition for relief pursuant to chapter 13 of the Bankruptcy Code on February 8, 2010, which case was subsequently dismissed for the Debtor's failure to file his bankruptcy schedules. *See* Case No. 10-50146.

Among the Debtor's personal property assets disclosed in the Bankruptcy Papers were possible tort actions against 21 putative defendants and possible breach claims against an additional six putative defendants (together, the "Scheduled Causes of Action"). *See id.* at 7. Although Form B6B of the Bankruptcy Forms ("Schedule B") instructs debtors to provide information as to the location of personal property assets, the Amended Bankruptcy Papers do not indicate addresses or contact information for the putative defendants of the Scheduled Causes of Action. *See id.*

The Debtor also listed certain liquidated judgment claims (the "Judgment Assets") among his personal property assets. *Id.* at 5. The Debtor valued the Judgment Assets at $38,500.00. *Id.* On May 4, 2012, counsel for the Trustee sent an email to the Debtor asking that he turn over any files related to the Judgment Assets. Exhibit E. The Debtor responded that he "no longer [had] any documents responsive to your request" and directed counsel to search for documentation through PACER. *Id.*

The Debtor subsequently amended his Bankruptcy Papers three times as follows:

- On April 30, 2012, the Debtor amended his Bankruptcy Papers adding to Schedule F a claim in the amount of $97,500.00 for W. Andrew LeLiever ("LeLiever"), the Debtor's pre-petition litigation counsel (the "April Amendment"). Bankr. D.E. 45 at 7. In the April Amendment, the Debtor also scheduled $5,000 in "lawsuit proceed/NSB [*sic*] – trust fund Andrew LeLiever" in his Schedule B and claimed an exemption in those funds in an amended Schedule C. *Id.* at 4, 6.

- On September 14, 2012, the Debtor further amended his Bankruptcy Papers, which amendment included a reduction in the amount of the claim

scheduled for LeLiever to $56,500.00 (the "September Amendment").
Bankr. D.E. 143 at 4. The Debtor also reduced the amount of the lawsuit
proceeds disclosed in his SOFA to $226,031.33 and disclosed gifts to
charities. *Id*. at 7, 9, 17.

- On October 19, 2012, the Debtor amended his Bankruptcy Papers again to
  disclose that $715.70 was being held in trust by LeLiever as of the Petition
  Date (the "October Amendment"). Bankr. D.E. 151 at 4.

The April Amendment, September Amendment, and October Amendment are referenced
together herein as the "Amended Bankruptcy Papers."

Despite these multiple amendments to the Bankruptcy Papers, the Amended Bankruptcy
Papers do not disclose any transfers of Lawsuit Proceeds to Dianna Jenkins. *See* Bankr. D.E. 45,
143 & 151. The Amended Bankruptcy Papers also do not disclose any interest in funds held in
Dianna Jenkins' bank accounts, any payments to creditors, or any payments or transfers made
outside the ordinary course of business. *See id*.

Documentation provided by LeLiever, attached as Exhibit F,[3] indicates that in the 90
days before the Petition Date, LeLiever was paid fees totaling approximately $4,640.00 from the
Debtor's gross Lawsuit Proceeds. The payments made to LeLiever are reflected in check
number 1137 for $350.00; check number 1139 for $1,140.00; check number 1143 for $1,350.00;
and check number 1144 for $1,800.00, each of which cleared LeLiever's trust account within 90
days of the Petition Date. *Compare* Ex. F-4 *with* Ex. F-7. However, the Bankruptcy Papers and
the Amended Bankruptcy Papers do not disclose any payments to LeLiever within 90 days of the
Petition Date. *See* Bankruptcy Papers and Amended Bankruptcy Papers, Bankr. D.E. 33, 45, 143
& 151.

---

[3]       Because Ex. F references certain confidential settlements, Ex. F will be filed under seal.

Documentation provided by LeLiever indicates that, in the 90 days before the Petition Date, a paralegal named Don Kovaleski ("Kovaleski") was paid fees totaling approximately $3,225.00 from the Debtor's gross Lawsuit Proceeds. These payments are reflected in check number 1133 for $1,354.00 and check number 1141 for $1,871.00, both of which cleared LeLiever's trust account within 90 days of the Petition Date. *Compare* Ex. F-4 *with* Ex. F-7. Nevertheless, the Bankruptcy Papers and the Amended Bankruptcy Papers do not disclose any payments to Kovaleski within 90 days of the Petition Date. *See* Bankruptcy Papers and Amended Bankruptcy Papers, Bankr. D.E. 33, 45, 143 & 151.

Despite his insistence that he retained "ownership" of the funds deposited to Dianna Jenkins' bank accounts, Defendant has stated in writing that he will not amend his Bankruptcy Papers to disclose any interest in funds held in those accounts. Exhibit G at 5-6. The Debtor also has refused to list additional creditors, to disclose any payments to creditors made within 90 days of the Petition Date, or to disclose the transfers of his net Lawsuit Proceeds to Dianna Jenkins (the "Transfers"). *Id.* at 4-5.

C.      **The Debtor Has Acknowledged Transferring His Lawsuit Proceeds to Dianna Jenkins, and Those Transfers Have Been Documented in Information Provided to the Trustee.**

On May 14, 2012, the Debtor appeared and was sworn at the meeting of creditors (the "Creditors' Meeting") in the Bankruptcy Case. Excerpts from the transcript of that meeting are attached as Exhibit H. When questioned regarding the disposition of the Lawsuit Proceeds, the Debtor testified that "my lawsuits' proceeds were deposited into my wife's account."[4] Ex. H at 3-4. The Debtor provided the following additional testimony relative to the Transfers:

---

[4]      In his Answer, the Debtor asserted that "[n]o lawsuit proceeds were transferred to Dianna Jenkins," contradicting his sworn testimony at the Creditors' Meeting. Ans., ¶¶ 41-43, 46-49, 51, 65-67 (D.E. 4). Dianna Jenkins' bank statements and documents obtained from the Debtor's litigation attorneys show that the Lawsuit Proceeds were deposited to Mrs. Jenkins' Bank Accounts. *See* Exhibits F, I, J & M; *see also*, Ex. P.

Q. Why have you put all of the proceeds into your wife's account; why don't you have a checking account?

A. I haven't had a bank account in years. For years before Federated ever sued me, I didn't.

Q. Why?

A. There was no need for us to maintain two accounts. I mean, the account is in her name and I am an authorized user of the account.

\*\*\*

Q. How much money do you think you have collected from this list of lawsuits in recent years?

A. I believe I put down, the best I calculated, my cut of the proceeds was about two hundred and thirty-five thousand for the last two years because it's in here, from April 12th of 2010, roughly, to April 11th of this year or April 10th of this year. Roughly around two hundred and thirty-five thousand, I believe is my cut.

\*\*\*

Q. When you collect funds from one of the entities that you filed a cause of action against, settled or whatever, monies come in to your attorney's trust account?

A. Right.

Q. And then it is disbursed out to you?

A. No, it is disbursed to my wife. He writes a check to my wife and we deposit it into the marital fund. I mean, there is nothing criminal or trying to hide anything.

\*\*\*

Q. The two hundred and thirty – I apologize for bouncing around here but the two hundred and thirty-five thousand lawsuit proceeds we determined was net of collection cost?

A. Those were my – those were proceeds disbursed to me.

Q. Disbursed to your wife?

A. Yeah, to my wife.

Q. Is your understanding of banking laws that a check payable to you could be deposited in your wife's account; would that –

A. If a check was made out to me, it could be deposited into my wife's bank account to the extent that I am an authorized user.

Q. And you are an authorized user?

A. I am an authorized user of that account, yes.

Q. So why does Mr. LeLiever make the checks payable to your wife; why aren't they payable to you? She is not a party to any of these.

A. Actually a couple of the settlements, if they were joint settlements to where the defendants required that she sign, can be a part of the settlement agreement.

Q. But that's not all of them?

A. No.

Q. But all of the disbursements are made payable to her?

A. Uh-huh.

8

> Q. Why is that?
> A. I have never considered – I don't know the answer to that question.

Ex. H at 12–15, 24–25.

The Trustee warned the Debtor that he should amend his Amended Bankruptcy Papers if they included any errors because any document filed with the Court "needs to be accurate to the best of your knowledge." *Id.* at 7.

The Debtor also testified that, other than Federated, "there are no other creditors that I avoided paying." *Id.* at 3. Further, the Debtor ascribed his bankruptcy filing in part to the fact that Federated "won't take payments" on the Federated Judgment. *Id.* at 9-10.

In compliance with this Court's Orders,[5] Dianna Jenkins provided copies of bank statements on two bank accounts (the "Bank Statements"), a checking account at Branch Banking and Trust Company, account number xxxx0440 (the "BB&T Account"), and a checking account at Wells Fargo Bank, formerly Wachovia Bank, account number xxxx8590 (the "Wells Fargo Account," and together with the BB&T Account, the "Bank Accounts"). Copies of the Bank Statements for the BB&T Account and the Wells Fargo Account are attached as Exhibits I and J, respectively. As explained below, the Bank Statements document the Transfers of the Debtor's Lawsuit Proceeds to the Bank Accounts.

The Creditors' Meeting was continued, and on July 19, 2012, the Debtor appeared by telephone from California and testified in response to questions posed by the Trustee's attorney. Excerpts from the transcript of the continued meeting are attached as Exhibit K. At the continued Creditors' Meeting, the Debtor testified further as to Dianna Jenkins' Bank Accounts:

> Q. All right. I am going to talk now a little bit, ask you a little bit about your wife's checking account that you said you were an authorized user of.

---

[5] *See* the *Temporary Restraining Order* and the *Preliminary Injunction* entered in AP #12-5033 on April 20, 2012 and May 4, 2012, respectively.

A. Yes.

Q. Did you sign a signature card with BB&T for that checking account?

A. Yes.

Q. You did sign a signature card. So you are authorized to write checks –

A. I believe so.

Q. You think so, okay. Are you authorized to write checks on the account?

A. Yes.

Q. And have you ever written checks on the account?

A. Yes.

Q. And did you sign your name or your wife's name?

A. No, my name.

Q. Okay. Why didn't you list that account on your schedules?

A. Because the account doesn't belong to me. I am just an authorized user of it.

Ex. K at 19-20. The Debtor also testified that he had access to the funds transferred to Dianna Jenkins' Wells Fargo Account through permissive use of her ATM card. *Id.* at 24–25.

The Debtor has testified that he has not "been employed by anyone since 2008," and he accredited the foreclosure of his house and a vehicle to this fact. Ex. H at 33. According to the Debtor's testimony, the Lawsuit Proceeds have been his only income. Ex. K at 34. The Debtor also testified that he directed LeLiever to transfer the funds remaining in LeLiever's trust account as of the Petition Date to Dianna Jenkins after the Petition Date (the "Post-Petition Transfer"). *Id.* at 18.

During the July 19, 2012 Creditors' Meeting, counsel for the Trustee requested additional information regarding the tort claims included in the Scheduled Causes of Action, and the Debtor indicated that he "wouldn't have any addresses" for the putative defendants. *Id.* at 7-8. As for the basis of the scheduled tort claims, the Debtor testified that the alleged defendants had placed calls to his cell phone without his consent or had placed calls for third parties to his cell phone. *Id.* at 7-12. The Debtor testified that he did not know whether or not he had recordings of the calls that the putative tort defendants had placed to his cell phone. *Id.* at 9.

With respect to the breach claims included in the Scheduled Causes of Action, the Debtor

testified that he believed that the putative attorney-defendants had violated confidentiality provisions relative to his settlements of various litigation matters. Ex. K at 12-14.

The Debtor also testified that he did not have copies of any fee agreements with LeLiever. *Id.* at 25-26. The Debtor testified that he does not remember when he first met Kovaleski other than "[i]t was a number of years ago." *Id.* at 29. The Debtor further testified that Kovaleski is "LeLiever's paralegal." *Id.* The Trustee's attorney requested documentation of the Debtor's relationship with Kovaleski, including copies of emails and phone records. *Id.* at 29-31. The Debtor responded that he does not have copies of email correspondence with Kovaleski. Ex. G at 6, ¶ 11. As for phone records relative to calls with Kovaleski, the Debtor refused to provide those records. *Id.*

In contrast to the Debtor's testimony, LeLiever has indicated that the Debtor insisted on Kovaleski's involvement with the Debtor's litigation matters. <u>Exhibit L</u>. According to LeLiever, he "didn't hire [Kovaleski] for [his] firm" but rather "put him in the [contingency fee] contract" with the statement to the Debtor that "if you want to agree to paying this outside paralegal, you can."[6] *Id.*

Through a series of Orders entered in the Bankruptcy Case,[7] the Trustee obtained certain documentation from LeLiever, including information as to various settlements of the Debtor's lawsuits, records regarding LeLiever's trust account, and copies of checks that LeLiever issued to Dianna Jenkins for the Lawsuit Proceeds. *See* Ex. F.

The Trustee obtained an Order requiring the Debtor's other pre-petition litigation

---

[6]     LeLiever has provided copies of certain contingency fee agreements to the Trustee that indicate LeLiever's fee reflected 33% of any recovery and, in some instances, Kovaleski was to receive an additional 15% to 18% of any recovery.

[7]     These Orders are:  Bankr. D.E. 39 (*Order Granting Trustee's Motion for Turnover of Documents Relating to Litigation Claims Asserted by the Debtor*), Bankr. D.E. 58 (*Order Granting* Ex Parte *Motion for Rule 2004 Examination of and Production of Documents By W. Andrew LeLiever and LeLiever Law, P.A.*) and Bankr. D.E. 127 (*Order Granting Motion to Compel*).

counsel, J. Blake Norman ("Norman"), to turn over records regarding disbursement of the Lawsuit Proceeds, including trust account information. Bankr. D.E. 51. Redacted copies of documents obtained from Norman that are relevant to the Motion are attached as <u>Exhibit M</u>.[8]

On July 24, 2012, Dianna Jenkins emailed correspondence from BB&T to the Trustee's attorney indicating that the Debtor was an "authorized user" but not an "account owner" of Dianna Jenkins' account at BB&T (the "BB&T Account"). <u>Exhibit N</u>.

During the continued Creditors' Meeting on July 19, 2012, counsel for the Trustee advised the Debtor that it was his responsibility to ensure that his bankruptcy papers are correct. Ex. K at 16. In particular, the Debtor was advised that he was required to list payments to creditors made within 90 days of the Petition Date and transfers to Dianna Jenkins made within two years of the Petition Date. *Id.* at 16-18. After the continued Creditors' Meeting, on July 19, 2012, counsel for the Trustee sent the Debtor an email regarding certain additional amendments that should be made to the Amended Bankruptcy Papers and cautioning the Debtor "to review your bankruptcy papers carefully and to seek the advice of bankruptcy counsel in order to ensure that your Petition is complete and accurate." <u>Exhibit O</u>. However, as noted above, the Debtor has refused to amend his Amended Bankruptcy Papers to disclose any interests in funds held in Dianna Jenkins' Bank Accounts, additional creditors, payments to creditors, transfers to insiders, and the like. Ex. G. at 4-6.

The Debtor included with his July 25, 2012 email (Ex. G) a summary of his net Lawsuit Proceeds. *Id.* at 7-8. The Debtor also attached a copy of the BB&T Account authorization form to his correspondence. *Id.* at 9. The Debtor reiterated that he is not the owner of the BB&T Account. *Id.* at 5-6. Further, the Debtor stated that the Transfers to Dianna Jenkins did not

---

[8]    The documents included in Ex. M reference certain confidential settlements and, therefore, Ex. M will be filed under seal.

reflect payment "for any goods or services" or for "any extensions of credit or money loaned." *Id.* at 5. Instead, the Debtor indicated that the Transfers to Dianna Jenkins "were merely a conduit to deposit funds into the marital account" and that he "did not lose ownership or interest in the [Lawsuit Proceeds]" so transferred. *Id.*

Review of the Debtor's summary of the Lawsuit Proceeds, Dianna Jenkins' Bank Statements, the information from LeLiever and the information from Norman indicates that after the date of the Federated Judgment, March 16, 2010, the Debtor caused $227,734.00 to be transferred to Dianna Jenkins, as illustrated on the summary of this documentation attached as Exhibit P.[9] Of this amount, $64,566.00 was transferred to Dianna Jenkins within one year of the Petition Date. *Id.*

In email correspondence of August 29, 2012 Dianna Jenkins stated that "it was Mr. Jenkins, not me, who spent his proceeds, by writing checks and making ATM withdrawals as the bank records show."[10] Exhibit Q. Dianna Jenkins also denied being "the recipient of any transfer." *Id.* However, Dianna Jenkins' Bank Statements, coupled with the copies of the checks issued to her by LeLiever and Norman, the list of Lawsuit Proceeds provided by LeLiever, and the summary of the Lawsuit Proceeds provided by the Debtor, and the Debtor's testimony and written statements, demonstrate that Lawsuit Proceeds were deposited to Dianna Jenkins' Bank Accounts.[11] *See* Ex. P (summarizing information on Exs. F, G, I, J, & M).

On October 5, 2012, the *Debtor's Opposition to Trustee's Motion for Order Surcharging*

---

[9]   Because the Debtor's settlements with various defendants were confidential, Ex. P will be filed under seal. Counsel has attested to the manner in which Ex. P was compiled in the affidavit in support of the Motion filed contemporaneously with the Motion and this Brief. The Debtor's September Amendment to his Bankruptcy Papers states that he received a total of $226,031.33 in the two years before the Petition Date.

[10]   Ex. Q has been redacted to avoid prejudicing Dianna Jenkins in AP #12-5033.

[11]   Ex. F-4 includes copies of certain checks made payable to and endorsed by Dianna Jenkins. Exs. F-1, F-3, F-5 & F-6 reference certain checks made payable to Dianna Jenkins; Ex. F-7 shows the clear dates of checks made payable to Dianna Jenkins. Ex. F-2 consists of a list of settlements and settlement amounts that was prepared by LeLiever.

*Debtor's Exemptions* was docketed in the Bankruptcy Case (the "Debtor's Objection"). Bankr.

D.E. 147. In that pleading, the Debtor stated that:

> All of the Debtor's income, for years, regardless of source, had been deposited to a marital account that had been opened years prior to the filing of the bankruptcy and years before any judgment had been obtained against the Debtor. The account was in the name of the Debtor's wife, not the Debtor. The Debtor was an authorized user of the account. . . . This was not illegal nor was it criminal.

Debtor's Objection at ¶ 6.[12] In a footnote, the Debtor stated that he "had no legal title" to the

account referenced in the Debtor's Objection. *Id.*, ¶ 6, n.3. The Debtor stated further that he

"'owned' his funds in the account that were spent pre-petition therefore since no funds existed at

the time of filing, no funds are listed." *Id.*

Although he was an authorized user of the BB&T Account and retained control over the

Lawsuit Proceeds transferred to that account as well as access to funds transferred to the Wells

Fargo Account, as of the Petition Date, the Debtor had not drawn on either of the Bank Accounts

to satisfy the Federated Judgment. *See* Petition, Bankr. D.E. 1, at 9.

## V.    ARGUMENT

### A.    Entry of Summary Judgment as Requested Herein is Authorized by Rule 56.

Plaintiffs' Motion requests entry of summary judgment based on Rule 56 of the Federal

Rules of Civil Procedure ("Rule 56"), made applicable herein Rule 7056 of the Federal Rules of

Bankruptcy Procedure. A motion for summary judgment may be brought at any time up until 30

days after the discovery period has closed. Rule 56(b). Summary judgment for the moving party

is appropriate when the pleadings, responses to discovery, and the record reveal that no genuine

issue of any material fact exists and that the moving party is entitled to judgment as a matter of

law. Rule 56(c). With respect to motions for summary judgment, the United States Supreme

---

[12]    Presumably, references to the "marital account" are to the BB&T Account because the Debtor is an authorized user of that account. *See* Ex. G. at 9.

Court has instructed that factual disputes are "material" only to the extent that they may affect the outcome of the litigation, and they are "genuine" only if the evidence is sufficient for a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Bassett Seamless Guttering, Inc. v. GutterGuard, LLC*, 501 F.Supp.2d 738, 741 (M.D.N.C. 2007) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). Instead, the nonmoving party must come forward with "specific facts showing there is a *genuine issue for trial.*" *Id.* (emphasis in original).

Pursuant to 11 U.S.C. § 727(c)(1), Plaintiffs have standing to bring the objections to the Debtor's discharge asserted in the Complaint. Plaintiffs maintain that summary judgment is appropriate in this Adversary Proceeding based on the Debtor's admissions and the documentary evidence available to them. If Plaintiffs are granted summary judgment as to any one of their claims, the Debtor's discharge will be denied.

**B.      Plaintiffs Are Entitled to Summary Judgment on Their First Cause of Action Based on the Debtor's Admissions and Documentary Evidence of the Transfers.**

Plaintiffs' First Cause of Action asserts that the Debtor's discharge should be denied pursuant to 11 U.S.C. §§ 727(a)(2). That section of the Bankruptcy Code provides that a bankruptcy discharge will be denied to:

> a debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the Bankruptcy Code], has transferred, removed, destroyed, mutilated or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed—

15

    (A) property of the debtor, within one year before the date of the
      filing of the petition;

    (B) property of the estate, after the date of the filing of the
      petition[.]

§ 727(a)(2). Thus, a debtor may be denied a discharge pursuant to § 727(a)(2)(A) if the debtor

transferred property with the intent to defraud his creditors within one year of the date of filing a

petition for bankruptcy. *Tavenner v. Smoot,* 257 F.3d 401, 409 (4th Cir. 2001). The elements

that must be established to support a § 727(a)(2)(A) claim are that the debtor (1) transferred or

concealed, (2) the debtor's property, (3) with the intent to hinder, delay or defraud a creditor, (4)

within one year before the date that the bankruptcy petition was filed. *In re Abdelaziz,* 2012 WL

359756 at *2 (Bankr. M.D.N.C. Feb. 2, 2012). The elements that must be shown to prove an

action under § 727(a)(2)(B) are: (1) a transfer of property; (2) belonging to the debtor; (3) after

the date of the filing of the petition; (4) with intent to hinder, delay, or defraud a creditor or

officer of the estate. *In re Golob,* 252 B.R. 69, 78 (Bankr. E.D. Va. 2000). If the debtor admits

an intention to hinder, delay or defraud a creditor, the court need not rely on circumstantial

evidence. 2012 WL 359756 at *2 (citation omitted).

   As for the first element, the facts of this case show that the Debtor has admitted to

directing the Transfers of his Lawsuit Proceeds and the Post-Petition Transfer to Dianna Jenkins,

and her receipt of those Transfers is documented in the Bank Statements as well as the records

obtained from LeLiever and Norman. The definition of the term "transfer" provided in the

Bankruptcy Code includes "each mode, direct or indirect, absolute or conditional, voluntary or

involuntary, of disposing or parting with (i) property; or (ii) an interest in property." 11 U.S.C. §

101(54)(D). Congress intended that this definition be broad, and that it include deposits to bank

accounts. *In re Pulliam,* 279 B.R. 916, 920 (Bankr. M.D. Ga. 2002) (quoting S.Rep. No. 95-989,

95th Cong. 2d Sess. 27 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5813).

Therefore, each time that the Debtor's Lawsuit Proceeds were deposited to one of the Bank

Accounts, a § 101(54)(D) transfer of the Debtor's property occurred.

With respect to the second element of a § 727(a)(2) claim, because the Lawsuit Proceeds

resulted from actions brought in the Debtor's name, those funds reflected the Debtor's property.

The timing of the Transfers was such that Lawsuit Proceeds totaling $64,566.00 were transferred

to Dianna Jenkins within one year of the Petition Date, establishing the fourth element of a claim

under § 727(a)(2)(A). Ex. P. With respect to § 727(a)(2)(B), the Post-Petition Transfer was

made after the Petition Date. *Id.*

As for the third element, Plaintiffs maintain that the Transfers were made with the "intent

to hinder, delay or defraud a creditor." *Abdelaziz*, 2012 WL 359756 at *2. In testifying that the

"there are no other creditors" that he "avoided paying," except for Federated, the Debtor

essentially admitted to the presence of the element relative to an intent to hinder, delay or

defraud a creditor. Ex. H at 3. Moreover, the Transfers were made after entry of the Federated

Judgment to an account that the Debtor did not own. Ex. G at 5, 7-8 (listing "Settlement From

4/12/10 – 4/11/12 Breakdown").

Circumstantial evidence of the Debtor's intent to hinder, delay or defraud Federated (as

well as any other creditor holding a pre-petition claim) is evident in application of the "badges of

fraud" to the facts in this case. Courts are permitted to draw inferences from the facts and

circumstances of a debtor's case evident in certain badges of fraud in order to find intent. *See*

*Zanderman, Inc. v. Sandoval*, 153 F.3d 722, 1998 WL 497475 at *2 (4th Cir. 1998)

(unpublished) (citing *In re Woodfield*, 978 F.2d 516, 519 (9th Cir. 1992)). A review of the facts

in the Debtor's case indicates that the majority of the badges of fraud applicable in bankruptcy

cases are at play in this Adversary Proceeding. *In re Michael*, 452 B.R. 908, 917 (Bankr. M.D.N.C. 2011) (citing, among other cases, *In re Arnold*, 2009 WL 5217056 at *4 (Bankr. M.D.N.C. Dec. 30, 2009)).

In *Arnold*, the court listed the following badges of fraud: (1) family, friendship or insider relationships between the parties; (2) the debtor's retention of possession, benefit or use of the property in question; (3) the lack or inadequacy of consideration for the transfer; (4) the debtor's financial condition before and after the transfer; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the events and transactions under inquiry; (7) the debtor's attempt to keep the transfer a secret; and (8) the proximity of the transfer to the debtor's filing bankruptcy. 2009 WL 5217056 at *4. The presence of even one factor can necessitate the court's finding that a transfer was fraudulently made, while the presence of several factors can lead to the conclusion that the debtor possessed the requisite fraudulent intent. *Zanderman* 1998 WL 497475 at *2 (citing *In re Penner*, 107 B.R. 171, 175 (Bankr. N.D.Ind. 1989) (citations omitted)). A debtor's transfer of an interest in property to the debtor's spouse for no consideration satisfies a number of the enumerated badges of fraud, particularly when the transfer is not disclosed in the debtor's bankruptcy papers. *In re Matus*, 303 B.R. 660, 673 (Bankr. N.D. Ga. 2004). For example, in *Matus*, the court denied discharge to a debtor who transferred a half-interest in his home to his wife while continuing to live in the home and during a period that he was involved in state court litigation. *Id.*

The Debtor has made repeated, affirmative statements that demonstrate a finding of intent based on application of the badges of fraud. In papers filed with the Court, the Debtor has stated that all of his income has been deposited to Dianna Jenkins' Bank Accounts for years. Debtor's

Objection at ¶ 6 (Bankr. D.E. 147). Thus, the Debtor admitted to the first badge of fraud relative to a family relationship. The Debtor also has acknowledged the existence of the second badge of fraud, his retention of possession, benefit or use of the transferred Lawsuit Proceeds. Ex. G at 5. Further, the Debtor has admitted to writing checks on the BB&T Account as an authorized user as well as to making permissive withdrawals from both of the Bank Accounts. Ex. K at 19-20. And Dianna Jenkins has stated that the Debtor spent the Lawsuit Proceeds deposited to her Bank Accounts. Ex. Q.

The Debtor has acknowledged that he received no consideration for the Transfers by stating that they were not made in connection with the payment of any obligations owed to Dianna Jenkins. Ex. G at 5. This admission shows the presence of the third badge of fraud, a lack of consideration for the Transfers. Because the Lawsuit Proceeds that were transferred reflected the Debtor's only income, the fourth badge of fraud with respect to the Debtor's financial condition before and after the Transfers is at play here. Ex. K at 34. Federated had filed suit and obtained judgment against the Debtor before he made the Transfers, satisfying the fifth badge of fraud. *Compare* Ex. A *with* Ex. P. That the Debtor sought to conceal the Transfers is evident in the fact that he has refused to disclose them in his Amended Bankruptcy Papers, satisfying the seventh badge of fraud. Ex. G at 5. The Transfers continued until about two weeks before the Petition Date, demonstrating the eighth badge of fraud. Ex. P. LeLiever issued a check for the Post-Petition Transfer one day after the Petition Date. Ex. F-4 (including a copy of check #1145 dated 4/12/12).

In sum, multiple Transfers were made in the year before the Petition Date, with the last pre-petition transfer occurring on March 26, 2012, just 16 days before the Petition Date. Ex. P. The Transfers continued after the Petition Date with the Post-Petition Transfer. Ex. F-4

(including copy of canceled check #1145).    As was the case in *Arnold*, there can be no coincidence that the Transfers prevented Federated from executing on the Federated Judgment. *Arnold*, 2009 WL 5217056 at *5.    Therefore, application of the badges of fraud leads to the conclusion that the Debtor made the Transfers, including the Post-Petition Transfer, with "with intent to hinder, delay, or defraud a creditor or an officer of the estate."    For these reasons, the Debtor's discharge should be denied pursuant to § 727(a)(2).

### C.    Plaintiffs are Entitled to Summary Judgment on Their Third Cause of Action Based on the Debtor's False Oaths in the Bankruptcy Papers.

Plaintiffs' Third Cause of Action asserts that the Debtor's discharge should be denied pursuant to 11 U.S.C. §§ 727(a)(4).    That section of the Bankruptcy Code provides that a bankruptcy discharge will be denied if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."    § 727(a)(4)(A).    Section 727(a)(4) of the Bankruptcy Code "essentially codifies a fundamental policy of the Bankruptcy Code—that only honest, unfortunate debtors receive a discharge, and thus the benefit of a fresh start." *Matus*, 303 B.R. at 675.

A debtor's petition, schedules and SOFA are executed under oath, and the Bankruptcy Forms warn the debtor that they are signed under penalty of perjury.    The Bankruptcy Code, Bankruptcy Rules and Bankruptcy Forms are designed "to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction."    *In re Bratcher*, 289 B.R. 205, 218 (Bankr. M.D. Fla. 2003).    That is, the trustee and the debtor's creditors should not have to "engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." *Id.* (citing *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir. 1987)).

Courts have held that a debtor's failure to disclose assets or transactions in the debtor's

schedules or SOFA may warrant denial of discharge pursuant to § 727(a)(4).  *Michael*, 452 B.R.

at 919 (citations omitted).  In the Fourth Circuit, a false oath must be related to a matter that is

material to the debtor's case.  *In re Pepper*, 2011 WL 5288737 at *2 (Bankr. M.D.N.C. Nov. 2,

2011) (citing *Williamson v. Fireman's Fund Inc. Co.*, 828 F.2d 249, 251 (4th Cir. 1987)).

> In denying a debtor's discharge for making a false oath, courts have found that

>> [t]he requisite intent to deceive exists where a debtor, ***in the first instance***
>> of filing a petition, schedules, or statement of financial affairs, makes
>> statements—excluding honest mistakes—that are inconsistent or
>> incompatible with his own knowledge and information. . . .  Accordingly,
>> if the [debtor's] schedules and statements as filed contained materially
>> incorrect information, then [] discharge should be denied.

*Michael*, 452 B.R. at 919 (citing *In re McLaren*, 236 B.R. 882, 895 (Bankr. D.N.D. 1999))

(emphasis added).  As was the case in *Michael*, the record in the Debtor's case "contains ample

evidence" that the Debtor's Bankruptcy Papers were deficient when first filed on April 24, 2012,

and "even subsequent amendments did not correct misstatements and omissions."  *Id.*   Other

courts have concluded that a "pattern of concealment or nondisclosure" can be sufficient to

support an inference of the requisite intent under § 727(a)(4).  *In re Poffenberger*, 471 B.R. 807,

819 (Bankr. D.Md. 2012) (quoting *Hatton v. Spencer (In re Hatton)*, 204 B.R. 477, 483 (E.D.Va.

1997) (further citation omitted).  Further, a "reckless indifference to the truth" works as the

"functional equivalent of fraud."  *Id.*   Moreover, a debtor's subsequent disclosure does not

expunge a prior false oath.  *Id.* (citing *Rosenbam v. Kilson (Matter of Kilson)*, 83 B.R. 198, 203

(Bankr. D. Conn. 1988)).

In this case, the most glaring omission in the Debtor's Bankruptcy Papers and Amended

Bankruptcy Papers is his failure—indeed, refusal—to disclose the Transfers to Dianna Jenkins.

The Debtor has justified not disclosing the Transfers because he "did not pay Dianna Jenkins for

any goods or services and neither did [he] pay her for any extension of credit or money loaned,

therefore no payments were made to Dianna Jenkins." Ex. G at 5. The Debtor's decision not to disclose the Transfers fails to take the plain meaning of § 101(54)(D) as well as the instructions on the SOFA into account.[13]

Further, among the omissions evident to Plaintiffs are that the Debtor listed only selected creditors in his Bankruptcy Papers. The term "creditor" is defined in the Bankruptcy Code as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor . . . ." 11 U.S.C. § 101(10)(A). That the Debtor did not pay due regard to this definition in preparing and filing his Amended Bankruptcy Papers is apparent based on his argument, for example, that utility providers are not "creditors" because "[t]hey receive contemporaneous payments for services rendered . . . ." Ex. G at 5. Additionally, the Debtor appears to have collected $16,255.00 in net Lawsuit Proceeds in the 90 days before the Petition Date (*see* Ex. P), but the Debtor's Amended Bankruptcy Papers do not disclose whether any of those funds were used to pay creditors.

The Debtor has maintained—contradictorily—that he is not required to disclose any interest in the BB&T Account because he is not an "owner" of that account, but that he did not "lose ownership or interest in" the funds that were transferred to Dianna Jenkins. Ex. G. at 5. In any event, the Debtor's Amended Bankruptcy Papers do not disclose the Transfers or the Debtor's continued "ownership or interest" in the funds that were deposited to Dianna Jenkins' Bank Accounts.

That the Debtor filed multiple amendments to his Bankruptcy Papers does not change the fact that his numerous omissions warrant a denial of discharge. The Debtor has disregarded the warnings that he has received from the Trustee and the Trustee's attorney relative to the amount

---

[13]   The instructions on Official Form B7, the SOFA, state that, with respect to item 10a, debtors are required to list all property transferred outside the ordinary course of business or financial affairs of the debtor within two years of bankruptcy.

of care that bankruptcy debtors must take when filing their bankruptcy papers. *See* Ex. H at 7; Ex. K at 36-37; Ex. O at 1.    The Debtor has argued that his failures to provide adequate information in his Amended Bankruptcy Papers was the result of a "good faith dispute as to whether the changes demanded by counsel for the Trustee were factually and legally correct." Debtor's Objection, ¶ 20.  Contradicting that position in the same pleading, the Debtor asserted that it was the Trustee's "duty" to instruct the Debtor to amend his Amended Bankruptcy Papers to disclose the funds that were the subject of the Post-Petition Transfer.  *Id.* at ¶¶ 17-19. However, the Debtor is unable to cite to any authority for shifting the burden of ensuring the accuracy of the Debtor's bankruptcy filings to the Trustee or the Trustee's attorneys.

In sum, the Debtor has demonstrated a reckless disregard for the truth and an indifference to the disclosures required by the Bankruptcy Code, Bankruptcy Rules and Bankruptcy Forms. *See In re Gordon*, 2002 WL 925028 at *3 (Bankr. M.D.N.C. May 8, 2002) (denying the debtor's discharge pursuant to § 727(a)(4)).  For these reasons, Plaintiffs maintain that the Debtor should be denied a discharge pursuant § 727(a)(4).

### D. Plaintiffs are Entitled to Summary Judgment on Their Second Cause of Action Given the Debtor's Failure to Maintain Records and Refusal to Provide Records.

Among other requirements, § 521 of the Bankruptcy Code requires debtors to "surrender to the trustee any recorded information, including books, documents, records, and papers relating to property of the estate."  § 521(a)(4).   Discharge may be denied pursuant to § 727(a)(3) to

> a debtor that has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under the circumstances of the case[.]

Here, the Debtor's Scheduled Causes of Action include tort claims against a list of

23

putative defendants.  However, the Debtor has testified that he does not know whether or not he has recordings of the calls that these potential defendants allegedly placed to his cell phone.  Ex. K at 9.  He further testified that he does not have addresses for these putative defendants.  *Id*. at 8.  Because the Debtor cannot provide any factual support for the causes of action listed in his Schedule B to the Trustee, the Trustee cannot administer those claims as estate assets.  Given this lack of information, the Trustee was required to seek an Order from the Court preserving these and other causes of action for the benefit of the bankruptcy estate should the Debtor successfully pursue them after his case has been closed.  *See* Bankr. D.E. 155.

Likewise, the Debtor has testified that he does not have copies of emails or other documentation of his relationship with Kovaleski.  Ex. K at 31.  The Trustee has been unable to determine the nature of the Debtor's relationship with Kovaleski, including whether the Debtor and Kovaleski operated as partners.

Because the Debtor has either not preserved records necessary to administer his case or has refused to turn those records over to the Trustee, the Debtor's discharge should be denied pursuant to § 727(a)(3).

## VI.    CONCLUSION

Through bankruptcy, honest but unfortunate debtors may obtain a discharge of their pre-petition debts.  In this case, the Debtor has blatantly, repeatedly, and insistently admitted that he transferred the Lawsuit Proceeds to his wife while maintaining access to those funds—exemplifying the definition of a fraudulent transfer.  At the same time, the Trustee and his counsel have made significant efforts to obtain the Debtor's compliance with his bankruptcy duties while the Debtor has chosen to focus his efforts on arguing that his compliance is not required.  Given the fact of the Transfers and the Debtor's concomitant refusal to cooperate in

the bankruptcy process by making the disclosures required of him, the Debtor should be denied the benefit of a bankruptcy discharge.

Accordingly, for the reasons stated herein and to be addressed at the hearing on the Motion, Plaintiffs respectfully request that the Court grant the Motion, enter summary judgment for Plaintiffs as to each of Plaintiffs' causes of action, and provide such further relief as is just and proper.

This is the 22d day of January, 2013.

/s/ A. Cotten Wright
A. Cotten Wright (State Bar No. 28162)
Grier Furr & Crisp, PA
101 N. Tryon St., Suite 1240
Charlotte, NC  28246
Phone:  704.375.3720
Fax:  704.332.0215  Fax
cwright@grierlaw.com

Attorneys for the Trustee, James T. Ward, Sr.

/s/ Linda W. Simpson
Linda W. Simpson (State Bar No. 12596)
402 West Trade Street, Suite 200
Charlotte, NC 28202
Phone: (704) 332-7587
Fax: (704) 344-6666
linda_simpson@ncwba.uscourts.gov

United States Bankruptcy Administrator