# EXHIBIT H

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| In the matter of: | ) |
| | ) |
| MATTHEW A. JENKINS, | ) Case No. 12-50413 |
| | ) Charlotte, NC |
| Debtor. | ) May 14, 2012 |

TRANSCRIPT OF 341 MEETING OF CREDITORS

APPEARANCES:

James T. Ward, Trustee
404 Bethel Street
PO Box 240
Clover, SC 29710-0240

Matthew A. Jenkins
Pro se Debtor

Transcriber: Patricia Basham
6411 Quail Ridge Drive
Bartlett, TN 38135
901-372-0613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

payments. They wanted a lump sum payment. And then the IRS, after telling me that my lawsuit proceeds were not taxable, then came back just recently and sent me letters that targeted audit stuff that, no, these proceeds are taxable. So now I owe, you know, the IRS and the state. That's the only creditor issue that I have.

And I know that, you know, Judge Stevens' order said all but - you know, I have intentionally avoided paying all of my creditors, including, you know, plaintiff, Federated. Well, that was based on the oral testimony of Gregory Chocklett. There are no other creditors that I avoided paying. I only have one creditor and that was Federated.

You know, there were a number of issues with that order that Judge Stevens recognized was wrong, but he couldn't correct them because the BK stayed the civil proceedings.

Q. To your knowledge, the Bankruptcy Administrator or the court has not filed a notice of -

A. The clerk's presumed abuse notice? That was filed on May 7th.

Q. But the B.A. hasn't filed a notice for a hearing or has it? I don't see it listed here.

A. No. All I saw was the clerk's notice of presumed abuse. All of that other nonsense that Chocklett accused me of doing, depositing lawsuit proceeds in my kids' accounts and all of that other garbage, no, my lawsuits proceeds were deposited

into my wife's account. That has been my testimony for years. I don't have a bank account. That is the way we have always handled our finances long before Federated ever sued us. Even when I was an employee, my paycheck was being direct deposited into my wife's account.

Q. Okay. I see the notice of presumed abuse. It was filed and then you amended it. You amended something or they looked at it initially and said we don't have the information necessary and then subsequently you filed it?

A. Right, because I filed the bare-bones petition on April 11th and then I had fifteen days to file all of my schedules. I did my taxes on either the 14th or 17th. You have a copy of my taxes and when it was filed, and then that information got, you know, transposed into the schedules and everything, and I filed the schedules.

Q. I don't see where the B.A. has picked up this thing and put it before the court. It is not an automatic thing. Based on a review, it gets in front of a judge but it's not an automatic like it would be, you know, filing the – nothing is automatic if it gets headed off. If I tell the court that I don't want a case to be dismissed automatically for failure to file a credit deal.

A. Right, the schedules are not showing up –

Q. Is that they will not automatically dismiss it. If left alone, you know, that's an automatic dismissal. Failure

those?

A. I just know of this one change in the means test.

Q. Are you going to file that?

A. If you would like me to. Either way, I failed the means exam. It just means I failed it by a greater amount. If you feel it is necessary, I can - it doesn't make a difference on the outcome.

Q. I understand. Any document you have on file with the court, you know, needs to be accurate to the best of your knowledge and, if you find that there is an error in it and if we are going to ultimately be talking about it in any way, we need to be talking about what everybody sees as being the right number.

A. Okay.

Q. So if you have got an error in your petition any place, then you should amend it.

A. (Inaudible)

Q. You filed a Chapter 13 petition back in 2010?

A. Yes. What happened was I had four different loan servicers claim to be the owner of my mortgage. So I filed a Chapter 13 for a couple of reasons. Because I had recently been unemployed and fell behind on the home payments, so I wanted to try and modify the loan, but I didn't really know who actually owned it because four different lenders claimed to have been the owner - Chase, Wells Fargo, HSBC and One West

pro se's head. You should really have counsel to do a Chapter 13.

Q. You should have counsel for Chapter 7s, too.

A. I didn't think that mine was going to turn into some kind of complicated issue, but it has become a lot more complicated.

Q. Why did you file?

A. A Chapter 7? Well, initially for a couple of reasons. I mean, I had gotten notices from the IRS that I owe them gobs of money in back taxes and, of course, that is going to flow to the state to where now I am going to owe the state. So I thought the Chapter 7 would discharge the taxes but I found out after the fact that it was not going to affect them. I am still going to owe the taxes. There is nothing I can do about that.

And then also with Federated, they won't take payments. They want the forty thousand dollar lump sum judgment and there is no way. I can't do that. And we even tried, before I filed the petition on April 11th, after the hearing with Judge Stevens on April 10th, my counselor talked with the attorney for Federated, not Chocklett but John Player who represents him in the federal case, and tried to work out a payment plan. Again for the last time, he told him, "Look, if you are not willing to take payments, my client is going to go down and file a Chapter 7." And he said, no, his client

wants a lump sum, they don't want payments, and so - I mean, that's where we are at. If Federated would have taken payments or was still, you know, open to taking payments, then there is maybe something I could work out and there is no other creditors.

Q. What do you perceive their options were if they weren't going to take payments on it?

A. I know that the law doesn't impose a duty on them to take payments. I mean, I can't make them take payments, they are not going to do it but, you know, their attorney in state court keeps filing supplemental proceedings, you know, and keeps trying to hold contempt motions and have me held in contempt of court and then thrown in jail. I mean, it's just an ongoing thing that's been going on for, it seems like years now.

Q. For not paying the entire amount?

A. For one reason or another.

Q. And that's what you perceive to be their - or they perceive to be their option, rather than take payments, was to put you in jail?

A. It seems like that's how they want to extract their pound of flesh. I mean, look, the reality is this: There is no such thing as a debtor's prison but a judge can write an order that's impossible for you to comply with. And, by not complying with the order, you are now held in contempt of

"Okay, I haven't reviewed the file, what's going on?" So Chocklett mouthed off to him. And Stevens said, "Okay. You know your client was ordered to be here. He is not here. I am going to hold him in criminal contempt of court." And then, you know, Stevens acknowledged at the beginning of the order, if you look at it, on April 10th, he is saying, look, you know, I wasn't there but, based on Chocklett's testimony, which is oral testimony where he said, okay, another attorney told me that he has received over four hundred thousand dollars in proceeds since 2008 and he hides this money in his wife's bank account, in his kids' bank accounts in order to avoid paying all of his creditors, well, Judge Stevens used the illusory language in that order. He specifically said, "Well, it appears, based on what Chocklett is telling me, this is what is going on, but I don't know because Mr. Jenkins isn't here for me to question."

Now, on April 12th when we went back in court, Judge Stevens said, "I reviewed this file. There was no order for him to appear on the 10th. There was no order for him to produce his wife's bank statements. But we are not addressing any of the civil portion of this hearing because he filed BK."

Q. Why have you put all of the proceeds into your wife's account; why don't you have a checking account?

A. I haven't had a bank account in years. For years before Federated ever sued me, I didn't.

Q. Why?

A. There was no need for us to maintain two accounts. I mean, the account is in her name and I am an authorized user of the account. It is like, you know, I don't understand why there is an order to produce bank records of all of your lawsuit proceeds from 2008. I was never a plaintiff to a lawsuit in 2008. What Chocklett did was he transposed my case against Citibank where they sued me and I was a defendant in 2008, and then he went in there and said, oh, he goes and he sues all of those creditors. I never sued a creditor of mine. Not a single one of my lawsuits have been against any creditor of mine.

Q. How much money do you think you have collected from this list of lawsuits in recent years?

A. I believe I put down, the best I calculated, my cut of the proceeds was about two hundred and thirty-five thousand for the last two years because it's in here, from April 12th of 2010, roughly, to April 11th of this year or April 10th of this year. Roughly around two hundred and thirty-five thousand, I believe is my cut.

Q. Who else gets a cut?

A. Oh, there are legal fees involved. There is LeLiever. There is another individual involved.

Q. Who?

A. A paralegal that LeLiever uses and he has gotten

proceeds which I believe LeLiever was ordered to produce an accounting to you of the trust account and who is going to be paid out of the trust.

Then also I paid him on my own under LeLiever's supervision. I mean, you have seen my taxes. You know I have got forty-seven thousand dollars in charitable contributions that's documented. That doesn't account for what I have given in cash. I have got over another fifty grand in legal fees, you know, from my litigation with Federated and my other lawsuits that's not part of LeLiever's accounting.

I have got - I have traveled back-and-forth to California numerous times for a couple of reasons. My mom was diagnosed with cancer, so I went back-and-forth to visit her. Then also I received medical treatment in California. So I have probably been back-and-forth at least ten times.

Q. Has Mr. LeLiever represented you in all of these causes of actions that you have brought?

A. Since 2010, yes.

Q. And who did that before?

A. I was pro se in 2009 and then at some point in time in 2009, Mr. Norman, Rick Norman was counsel before Mr. LeLiever. And Federated Financial didn't even get a judgment against me - a default judgment on a case that had already been dismissed in 2010. They didn't get a final judgment until last year. So I am confused by this let's go all the way back to

2008 and provide records. I had no judgment creditors back then. I mean, why am I having to try and produce an accounting. Nor do I have any lawsuit proceeds. And I have always testified, you know, contrary to Chocklett's accusations that I am hiding money, I have always said all of my income has been deposited into my wife's account. It is a marital account. I testified to that two years ago, over two years ago at the deposition.

Q. When you collect funds from one of the entities that you filed a cause of action against, settled or whatever, monies come in to your attorney's trust account?

A. Right.

Q. And then it is disbursed out to you?

A. No, it is disbursed to my wife. He writes a check to my wife and we deposit it into the marital fund. I mean, there is nothing criminal or trying to hide anything. That's in the settlement agreement.

Q. When he writes a check to your wife for distribution of a settlement proceed, does he take his fees out?

A. Before.

Q. So he gives you the net?

A. Yes.

Q. And do you have a written agreement with him?

A. Yes.

Q. Do you have such an agreement?

A. With LeLiever?

Q. Do you have a copy of the agreement?

A. No, I have no copy with me at the moment.

Q. But do you have them in your records?

A. I will need to see what I can dig up. I know that Cotten asked LeLiever for all of the agreements pertaining to my litigation.

Q. Well, we picked up files at his office and there were no agreements in what he was turning over to us. It was noticeably absent. So are they all standard agreements?

A. No. I mean, when you say standard, some are contingency and some are contracts.

Q. But there is an agreement for each cause of action?

A. Yes.

Q. For each case?

A. Yes.

Q. When it is a contingency, what is the typical contingency?

A. His cut is around thirty-three percent and then whatever other legal costs are involved are taken out.

Q. So he pays the paralegal and other costs and then takes a third of that or he takes a third and then pays?

A. I believe he deducts the cost and takes a third after cost and then pays the paralegal fees, whatever the associate fees are and then what's remaining will be disbursed in a

check.

Q. Out of the two-thirds? He pays the legal fees out of the two-thirds?

A. Yes.

Q. So he gets a third off of the top?

A. He gets a third off of the top, yeah.

Q. And if it is a contract basis, it is an hourly basis?

A. Yes.

Q. But he pays himself before he makes distributions?

A. Yes.

Q. To your knowledge, of all of the funds that he has been involved in, the cases, is that where he has collected, where there has been a settlement, has all of that been disbursed?

A. Yes.

Q. Through the first quarter of the year, of this year?

A. Yes.

Q. Have you amended your schedules to show that he is owed ninety-seven thousand dollars?

A. Yes.

Q. What is that?

A. That is from the contract work that he did for me representing – that's a number of cases. It is representing me on the first appeal in the state case against Federated; representing me in the second appeal against Federated;

representing me as a defendant against Citibank last year in their counterclaim filed against me; and then the Seattle Service Bureau, the check you guys just got, he is entitled to a portion of that.

Q. So that has been out there for a good long while?

A. What has?

Q. Those fees?

A. Yeah, they have been out for a while.

Q. Do you have any idea why he wouldn't have just paid himself out of the fees that he has been disbursing to you, just set it off?

A. As an offset? There is no way that I would be able to live. I mean, being able to - (pause). I would not be able to live. I mean -

Q. I understand what you are saying but he is in a business and, you know, he is owed a hundred thousand dollars and he is sitting there with monies that he has control over that he could pay himself. Admittedly, it would probably destroy your business relationship to do that but he would get paid, and I am curious as to why he wouldn't do that.

A. Yeah, but there is no guarantee of a settlement. You know, it is easy to go back after the fact and say that, well, yeah, you know, there was money in an account that he could have yanked out but it doesn't work like that, practically speaking. I mean, there could be months and months before

there is a settlement and so, you know, if it was like one lump sum, two hundred and thirty-five thousand dollars, yeah, you know, take a cut out of it, but it doesn't work like that. It is a little bit of money here, a little bit of money there, a little bit of money here, a little bit of money there. To just say, hey, man, I am going to go ahead and keep the entire proceeds and you can pay me off, you're right, that is probably not good business sense on his end.

Q. What do you think Mr. LeLiever was looking at down the road that offered him any assurance that he was going to ever get paid?

A. There is no assurance that he is ever going to get paid but, I mean, he did - I guess you kind of look at it in the sense of an equity sense that, by handling the cases that I did give him, he at least got something rather than nothing. I mean, I could have kept my cases and, you know, and kept going, you know, *pro se*, and he would have gotten nothing but, you know, you never can induce him. It is like, you know, here, you can represent me in these cases and get your cut and at least you get something and then maybe down the road if one of my lawsuits, you know, if there is a larger settlement, then I can work on trying to reduce some of the overall.

Q. Did you owe him the ninety-seven thousand, five hundred dollars a year ago?

A. I don't know what the time frame is because the first

amount that I would have owed him would have been for doing the first appeal in the Federated case. So I don't know what the time frame was on that one. The second appeal was last year. The defense in the Citibank case was last year.

Q. So what you are saying to me and to him is that I need the money to live on and I will pay you when I can?

A. Yes.

Q. How do you justify the forty-seven thousand dollar contribution to the church if you owed your lawyer a hundred thousand?

A. (No response.)

Q. What do you say to him?

A. Well, Mr. LeLiever has been very accommodating as far as having to, you know, work with me on my cases and things, so -

Q. That didn't trouble him that -

A. I don't know. I can't speak for him. I don't know whether it did or not.

Q. Are you a lawyer?

A. No.

Q. Do you have any legal training?

A. Yes.

Q. What is that? Where did you get that?

A. I am in law school.

Q. How long were you in law school?

Q. Well, certainly you would on *pro se*.
A. Right but, no, only on a complaint if I drafted one to file on my own and LeLiever has come in after the fact but, no, I don't draft anything. I am not qualified to really draft anything on a claim.
Q. The documents that have been drafted and filed in the bankruptcy court?
A. Yeah, those are mine.
Q. Those are yours?
A. Well, yeah, but there is only one. It is just my opposition to GC Services when Karen wanted to do a debtor's exam of me and she is a possible judgment debtor. She has no right to depose me as a creditor. Yeah, I did some research on that.
Q. You have a set of law books at home or do you -
A. I have a Pacer account and a LEXIS account.
Q. The two hundred and thirty - I apologize for bouncing around here but the two hundred and thirty-five thousand lawsuit proceeds we determined was net of collection cost?
A. Those were my - those were proceeds disbursed to me.
Q. Disbursed to your wife?
A. Yeah, to my wife.
Q. Is your understanding of banking laws that a check payable to you could be deposited in your wife's account; would that -

A. If a check was made out to me, it could be deposited into my wife's bank account to the extent that I am an authorized user.

Q. And you are an authorized user?

A. I am an authorized user of that account, yes.

Q. So why does Mr. LeLiever make the checks payable to your wife; why aren't they payable to you? She is not a party to any of these.

A. Actually a couple of the settlements, if they were joint settlements to where the defendants required that she sign, can be a part of the settlement agreement.

Q. But that's not all of them?

A. No.

Q. But all of the disbursements are made payable to her?

A. Uh-huh.

Q. Why is that?

A. I have never considered - I don't know the answer to that question.

Q. In fact, it will be a question to Mr. LeLiever is how is he - why is he releasing trust funds to a party who is not a party to the settlement.

A. I believe he inquired as to that with the state bar and he is allowed to disburse settlement funds to whomever the funds are entitled to or they can dictate who the funds get disbursed to. So, for example, if I wanted to - say, for

numbers.

Q. You have filed all of your tax returns for all of those periods, right?

A. Yes, you have them or Cotten has them.

Q. I have '10.

A. 2010 and 2011.

Q. And '11. I don't have 2009. You were in law school for a year?

A. Yes.

Q. Three quarters, whatever. Is it quarters, semester?

A. It is in California. No, they don't have semesters. They are quarters, so a year.

Q. You don't have a salaried job?

A. No.

Q. When did you last have a salaried job?

A. I have never had a salary but, as far as earning income, I was with Brothers Air and Heat in 2008.

Q. Well, salaried, hourly pay --

A. I haven't been employed by anyone since 2008.

Q. Okay.

A. Which is why I got foreclosed on and had a vehicle repossessed.

Q. You have never owned any real estate in your name; have you?

A. No. We owned - wait a minute, excuse me. The