# EXHIBIT K

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| In the matter of: | ) |
| | ) |
| MATTHEW ALAN JENKINS, | ) Case No. 12-50413 |
| | ) Charlotte, NC |
| Debtor. | ) July 19, 2012 |

TRANSCRIPT OF 341 MEETING OF CREDITORS

APPEARANCES:

Linda Simpson
U.S. Bankruptcy Adm.'s Office
402 West Trade Street
Suite 200
Charlotte, NC 28202

A. Cotten Wright
Grier, Furr & Crisp P.A.
101 North Tryon Street
Suite 1240
Charlotte, NC 28246

Transcriber:                Patricia Basham
                           6411 Quail Ridge Drive
                           Bartlett, TN  38135
                           901-372-0613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

7

1    Q.        Do you have any investment accounts anywhere?

2    A.        No.

3    Q.        Okay.  As to the judgment that you obtained against

4    NR Group, tell me what attempts you made to collect on that.

5    A.        I didn't make any attempts.   It was a default

6    judgment.  As far as I know, those people were no longer in

7    business.

8    Q.        How did you determine that?

9    A.        It was a cursory Internet search.

10   Q.        Okay.  What about Davis Davis Attorneys, did you make

11   any attempts to collect on that judgment?

12   A.        No.

13   Q.        You stated that you thought that they were out-of-

14   business.  How did you determine that?

15   A.        All I did was look on the Internet.

16   Q.        You listed a number of unliquidated, contingent tort

17   claims.

18   A.        Yes.

19   Q.        I want to go through those with you now, if you don't

20   mind.

21   A.        Okay.

22   Q.        Allied Interstate.   Now, what I am asking you to

23   provide are the factual basis and I will need an address, and

24   I will need to know the legal basis for the claim, other than

25   just tort.  And I realize you may not have all of the addresses

8

1   with you today.

2   A.        Well, I wouldn't have any addresses.   As far as

3   Allied Interstate, they were calling my cell phone without my

4   consent, leaving prerecorded messages.   That is all I know

5   about it.  I mean, regarding the contingent claims, it asked me

6   to list any claim that I may have, as well as what I think I

7   have.  So, you know, in order to be safe, rather than sorry, I

8   listed everything.  You know, at the end of the day, they may

9   not be claims that can be pursued but I wanted to be safe.  So

10   the basis for that claim was they placed calls to my cell phone

11   without my consent.

12   Q.        Midland Credit Management, the basis for that claim?

13   A.        I don't remember what the claim against them was for.

14   It would have to do something with the consumer protection.   It

15   didn't have anything to do with Keith CPA.

16   Q.        Okay.   Northland Group?

17   A.        Probably placing calls to my cell phone without my

18   consent.

19   Q.        All right.  RGS Financial?

20   A.        RGS Financial, placing calls to my cell phone and my

21   home phone without my consent for a third party.

22   Q.        Now, I am going to interrupt myself for a minute.

23   You know the names of these companies but you don't have any

24   information -

25   A.        Only because of the prerecorded message that was left

9

1   or if I spoke with them.

2   Q.        Okay.  Have you recorded these calls?

3   A.        I don't know if I have any recordings of them.  It

4   has been a while.

5   Q.        Okay.

6   A.        The statute of limitations may have expired on some

7   of these claims, as well, I mean, so –

8   Q.        Okay.  What about First National Bank of Omaha?

9   A.        They were placing calls for a third-party to my cell

10  phone.

11  Q.        All right.  You listed Citibank but you had already

12  sued Citibank in Ohio; is that right?

13  A.        I did.

14  Q.        Is this another claim against Citibank?

15  A.        That, it is.

16  Q.        And what is it for?

17  A.        The same thing, placing calls to my cell phone

18  without my consent.

19  Q.        All right.  EOCCA?

20  A.        Placing calls to my cell phone without my consent for

21  a third party.

22  Q.        Interrupting myself for a minute, the third party –

23  you reference a third party.  In these instances, are they

24  usually the same third party or are they just random third

25  parties?

10

1    A.        No, they are random third parties.

2    Q.        Okay.  CBE Group?

3    A.        Placing  calls  for  a  third  party  to  my  cell  phone

4    without my consent.

5    Q.        CBCS?

6    A.        That would be the same thing.

7    Q.        LHR, Inc.?

8    A.        The same thing.  Calls to my cell phone without my

9    consent.

10   Q.        Law Offices of Mitchell Kay?

11   A.        The same thing.

12   Q.        Specialized Loan Servicing?

13   A.        The same thing.

14   Q.        Nationwide Credit, Inc., is that a new claim against

15   that entity?

16   A.        That  is  a  separate  claim  from  the  claim  you

17   liquidated.  So the origin of the phone calls that they were

18   calling for, for the claim that you settled, it was separate

19   from the claim that is listed there.

20   Q.        And what is this claim?

21   A.        Placing calls to my cell phone without my consent.

22   Q.        Okay.  City Financial, renamed as One Main Financial?

23   A.        Placing calls to my cell phone without my consent.

24   Q.        GMAC Mortgage?

25   A.        The same thing.

11

1    Q.        Did you ever have a mortgage with GMAC?

2    A.        I didn't have a mortgage with them.  I think there

3    may have been a loan servicer.  I don't know.  I am unclear on

4    that.

5    Q.        Okay.

6    A.        It has been a number of years.

7    Q.        Brockfield Law Group.

8    A.        That was placing calls to my home phone for a third

9    party, and they knew the number didn't belong to a third party.

10   Q.        Homecomings Financial.

11   A.        Calls to my cell phone without my consent.

12   Q.        Indymac?

13   A.        The same thing.

14   Q.        One West?

15   A.        The same thing.

16   Q.        Chrysler Financial renamed as T.D. Auto Finance?

17   A.        The same thing.

18   Q.        And then you have listed Federated Financial

19   Corporation and Greg Chocklett.

20   A.        Yes.

21   Q.        Is that another claim?

22   A.        That's a claim that arose post-petition.  That will

23   be for malicious prosecution and abuse of process.  They

24   instituted a criminal proceeding against me that resulted in my

25   favor by Mr. Chocklett lying to the court, and that arose on

12

1    April 12, post-petition, but I went ahead and listed it there,

2    just to be safe.

3    Q.       I am not going to comment on that except to tell you

4    that I have read the orders in that case, and I would disagree

5    with your characterization; but I appreciate your listing it.

6          Contingent breach claims against the following: Karen

7    Enloe.

8    A.       Well, you can lump Enloe, Player, Amy Rich, Bossio,

9    whatever her name was, and that had to do with Chocklett

10   representing to the court that an attorney, but he just

11   couldn't remember who, told him that I received four hundred

12   thousand dollars in lawsuit proceeds. So when he was

13   questioned, he just couldn't remember who it was. So there's

14   only three people that were a party to any of my settlement

15   agreements that knew about any kind of sums of money, and that

16   would have been one of those three people. So if Chocklett

17   didn't lie and an attorney told him that that is what I had

18   received, then it would be one of those three people, and my

19   money is on Enloe, because those are breach of those settlement

20   agreements to disclose that.

21   Q.       What about Rachel Ommerman?

22   A.       She was a party to one of the settlement agreements,

23   as well.

24   Q.       And what breach claim do you have against Rachel

25   Ommerman?

1    A.       She would have been one of the four. I didn't

2    remember who all was listed there.

3    Q.       And Tracy Vann?

4    A.       The same thing.

5    Q.       Are you saying that you think Tracy Vann breached by

6    having a conversation with Mr. Chocklett?

7    A.       One or more of them because they were the only

8    parties that were privy to the settlement agreements, you know,

9    on more than one occasion.

10    Q.       And Chad Echols, is he in –

11    A.       Yeah, he works with Tracy Vann. They are partners.

12    Q.       Okay.

13    A.       Going back to the Federated and the Chocklett claim,

14    you also have a violation of the automatic stay.

15    Q.       Really?

16    A.       Really. When they initiated the proceedings on April

17    12th, to me clearly that was a violation of the stay.

18    Q.       Well, the judge's order clearly says that he is

19    putting all of the civil action on hold because of the

20    automatic stay.

21    A.       Well, yeah, but that was despite Chocklett's

22    objections because Chocklett objected to that and wanted the

23    court to ignore the fact that I had filed for BK and wanted to

24    proceed with the civil action and Judge Stevens told him no.

25    So Chocklett proceeded to argue the criminal contempt, and

14

1    Judge Stevens this time said, "I carefully read the file.

2    There was no order for Mr. Jenkins to appear. He is not in

3    criminal contempt of court." Unlike on April 10th, when

4    Chocklett represented to the court that I was ordered to

5    a    p    p    e    a    r    .                    Q    .

6             Thank you. We will move on now to your "Statement of

7    Financial Affairs." You did not list any charitable gifts on

8    your "Statement of Financial Affairs," but you did list

9    charitable gifts on your tax returns. Can you clarify that for

10   me?

11   A.        I don't know what you are looking at. Can you give

12   me a little more information?

13   Q.        Do you have your bankruptcy papers in front of you?

14   A.        No, I do not.

15   Q.        Okay. Well, then, you are going to have to maybe try

16   to remember that there is a long list of questions after the

17   schedules. It is called a "Statement of Financial Affairs."

18   A.        Yes.

19   Q.        Question number one is income from employment; number

20   two is where you listed your lawsuit proceeds; and there is a

21   question that asks you to list out your charitable gifts – that

22   is question number seven – made within one year of the petition

23   date. Your 2011 tax return shows gifts to Cove Church and

24   Wycliffe Bible Translators. Do you remember that?

25   A.        Yes.

16

1    Financial Affairs," and we are going to go back now to question

2    three.   Question three is about payments to creditors and

3    question 3(a) is a question as to payments that were made to

4    creditors within ninety days of the petition date.   Now, I

5    understand from Mr. LeLiever that transfers were made to him

6    and possibly to Don Kovaleski within ninety days before the

7    petition date, but you have not listed any payments to

8    creditors within ninety days.

9    A.        I don't know if there was.   I don't know when the

10   last settlement came in and what the breakdown was offhand.

11   Q.        Okay.

12   A.        You have that information, so –

13   Q.        I have that information but it's your responsibility

14   to ensure that your bankruptcy papers are correct.   Now, I call

15   this attention to you because those are transfers I know that

16   were made.   But if, for example, you paid rent or anything else

17   like that within ninety days of the petition date, you need to

18   list that at 3(a).

19   A.        Isn't that a contemporaneous payment that wouldn't

20   need to be listed?

21   Q.        You list payments to creditors made within ninety

22   days of the petition date on your petition in order to make it

23   correct.   That's what it calls for.   You also had testified

24   when you met with Mr. Ward that you were in the habit of paying

25   bills, certain bills in cash.

17

1   A.        Yes.

2   Q.        You need to list that here, anything you paid in

3   ninety days of the petition date.  Now, a creditor wouldn't be

4   the grocery store.  If you go to the grocery store, you buy

5   groceries and you take them home with you.  You don't have to

6   list that.  But if you paid a creditor, a credit card company,

7   your landlord, Duke Power, Mr. LeLiever, if you paid a creditor

8   within ninety days, you have got to list it here whether it was

9   cash or check or credit card.

10  A.        Okay.

11  Q.        Okay.  We are still on their statement of financial

12  affairs and we are going to turn to question 3(c).  That

13  question asks you to list all payments made within one year to

14  or for the benefit of creditors who were insiders.  So if you

15  made any payments to insiders, you need to list those.

16  A.        Okay.  Go on.

17  Q.        Okay.  Question ten of your SOFA, your "Statement of

18  Financial Affairs," that asked for a list of anything that was

19  transferred within two years of the petition date and was

20  outside the ordinary course of business.  All those transfers

21  that were made to Ms. Jenkins were outside the ordinary course

22  of business and they need to be listed.

23  A.        I am sorry.  I don't understand you.

24  Q.        Question ten directs you to list transfers that were

25  made within two years of the petition date that were not in the

18

1    ordinary course of business.    The transfers to Ms. Jenkins

2    would fall under that umbrella.

3    A.        How so?

4    Q.        Because they were not in the ordinary course – are

5    you in the business of suing people, suing debt collectors; is

6    that your business?

7    A.        No.

8    Q.        No.    And you need to list the transfers to Ms.

9    Jenkins for the two years prior to the petition date where

10   settlement proceeds that you collected were transferred to her.

11   And since that wasn't your normal course of business, it is my

12   opinion you should also list the transfers to Mr. LeLiever and

13   Mr. Kovaleski on that same question.

14   A.        Go on.

15   Q.        Thank you.    There was a transfer from Mr. Leliever's

16   trust account to Ms. Jenkins.    It was made on the petition

17   date.    Did you direct him to make that transfer?

18   A.        You are talking about the balance of the trust

19   account?

20   Q.        Yep.

21   A.        Yep.

22   Q.        You told him to make that transfer?

23   A.        To give me the balance in the trust account, yes.

24   Q.        Okay.    You have indicated that you collected two

25   hundred and thirty-five thousand, two hundred and seventy-eight

19

1   dollars in settlement proceeds in the two years before the

2   petition date. I would like to see a detailed breakdown of

3   that. That would be the gross amount of each settlement, any

4   deduction for costs or attorney's fees and the net to you or to

5   Ms. Jenkins, as the case may be. Are you ready to move on?

6   A.      I am making a note.

7   Q.      Okay. Thank you. Let me know when you are ready.

8           (Pause)

9   A.      Go on.

10  Q.      All right. I am going to talk now a little bit, ask

11  you a little bit about your wife's checking account that you

12  said you were an authorized user of.

13  A.      Yes.

14  Q.      Did you sign a signature card with BB&T for that

15  checking account?

16  A.      Yes.

17  Q.      You did sign a signature card. So you are authorized

18  to write checks –

19  A.      I believe so.

20  Q.      You think so, okay. Are you authorized to write

21  checks on the account?

22  A.      Yes.

23  Q.      And have you ever written checks on the account?

24  A.      Yes.

25  Q.      And did you sign your name or your wife's name?

20

1   A.        No, my name.

2   Q.        Okay.  Why didn't you list that account on your

3   schedules?

4   A.        Because the account doesn't belong to me.  I am just

5   an authorized user of it.

6   Q.        Mr. Jenkins, if you signed a signature card and you

7   are authorized to sign checks on that account, you are an owner

8   of that account.

9   A.        No, I am not an owner of the account and the bank

10  would dispute that with you.

11  Q.        Okay.  Well, I am going to - we are going to need you

12  to get some paperwork to show that to me, please.  This is a

13  new concept in the law for me.  If you signed a signature card,

14  then that makes you an owner.

15  A.        It does not make you an owner.

16  Q.        Really?

17  A.        Really.

18  Q.        Okay.  Why don't you get from BB&T a copy of the

19  signature card and send it to me?

20  A.        Well, that really is impossible for me to do that

21  since I am in California and BB&T has no branches in

22  California.

23  Q.        That's immaterial, Mr. Jenkins.  BB&T has a telephone

24  number and they have a website.

25  A.        I don't have access to the website because the

24

1  A.        Yes, and that's another reason why, is because the

2  holds that would have been placed on them.  If it was a giant

3  check, there would have been a long hold time.

4  Q.        Thank you so much for responding.  You made

5  significant withdrawals in April of 2011 from that account.

6  Can you tell me why, what was going on then?

7  A.        No, I don't have that information in front of me.

8  Q.        You requested four separate checks of eight thousand

9  dollars each on June 17, 2011.  Can you tell me why?

10  A.        The same reason.  I didn't want long hold times

11  placed on a giant check.  It's just easier to deposit smaller

12  amounts.

13  Q.        Did you sign a signature card on your wife's Wells

14  Fargo, Wachovia/Wells Fargo account?

15  A.        No.  I don't have access to that account.

16  Q.        When did you last have a bank account?

17  A.        I think in 2006 before I moved to North Carolina.

18  Q.        Did you have an ATM card on your wife's checking

19  accounts?

20  A.        Which account are you referring to?  And, no, I don't

21  have an ATM card.  I have access to her ATM card but no.

22  Q.        So you use her ATM card to access funds in either of

23  the two accounts?

24  A.        Yes, I can.  Well, since BB&T doesn't have a branch

25  in California and I was in California, I accessed the Wells

25

1    Fargo account through the ATM.

2    Q.        You had testified to Mr. Ward that you occasionally

3    paid Mr. LeLiever in cash; is that right?

4    A.        Yeah, for some of the Federated hearings.

5    Q.        For some of the Federated hearings?

6    A.        That was a long time ago.

7    Q.        How long ago was that?

8    A.        I don't remember.  The Federated thing has been going

9    on since 2009.

10   Q.        Do you recall about how much you paid him when you

11   paid him in cash?

12   A.        Total?

13   Q.        Per time.  Like if he showed up at a hearing, you

14   would pay him what, his hourly fee for -

15   A.        Five hundred per hearing.

16   Q.        And did you have an agreement with Mr. LeLiever, an

17   engagement agreement with respect to the Federated matter?

18   A.        No, because that was when Blake Norman couldn't

19   appear, so it was on the fly.

20   Q.        And you never signed an engagement agreement?

21   A.        Well, wait a minute.  You are talking about just for

22   when he would appear in place of Norman?

23   Q.        Mr. Jenkins, they were your lawsuits and I wasn't

24   there.  Now, I just heard you say that you paid Mr. LeLiever to

25   appear at hearings on your behalf, and my question was did you

26

1    have an engagement agreement with Mr. LeLiever to represent you

2    in the Federated case?

3    A.        You know, I don't know.  That has been years.  It has

4    been going on for years.  I don't remember back then.

5    Q.        Do  you  have  any  records  of  any  agreements,

6    contingency  fee  agreements,  engagement  letters,  flat  fee

7    agreements, any agreements with Mr. LeLiever?

8    A.        I don't have any copies of anything.

9    Q.        You  did  not  maintain,  keep  any  copies  of  any

10   agreements with Mr. LeLiever?

11   A.        No.

12   Q.        Do you recall signing any such agreements?

13   A.        Yes.

14   Q.        Did you sign contingency fee agreements for each of

15   the matters he represented you on?

16   A.        That I was a plaintiff in.

17   Q.        What about the other matters in which he represented

18   you, did you sign anything?

19   A.        Yeah, when I was a defendant.  Those were contract

20   cases.

21   Q.        Okay.  And which cases are you talking about now?

22   A.        The ones that I listed there for the appeals, the

23   first and second appeal, the criminal contempt hearing, the

24   Citibank as a defendant, those are hourly cases.

25   Q.        Citibank was hourly.  And when you are talking about

29

1   A.       Was I responsible for hiring him?

2   Q.       Yes.

3   A.       I don't know what that means.   He is LeLiever's

4   paralegal.

5   Q.       Really?

6   A.       It is the paralegal he uses.

7   Q.       Well, that's the paralegal he uses but, based on the

8   e-mail correspondence I have seen that Mr. LeLiever provided,

9   it looks as though you were the link between LeLiever and

10  Kovaleski rather than the other way around.

11  A.       I don't know what e-mails you have seen.

12  Q.       I am sure you don't.   I have seen e-mails where you

13  told Mr. LeLiever how much to pay Mr. Kovaleski and you

14  provided Mr. Kovaleski's address.   Does that help you remember?

15  A.       I don't know.   As far as I know, Kovaleski has his

16  address and his own e-mail heading.

17  Q.       That wasn't the question; was it?

18  A.       I believe I did just answer your question.   You just

19  asked me if I remembered.

20  Q.       How do you know Mr. Kovaleski, Mr. Jenkins?

21  A.       I know him as a paralegal.

22  Q.       How did you first meet Mr. Kovaleski?

23  A.       I don't remember.   It was a number of years ago.

24  Q.       What agreement did you have with Mr. Kovaleski?

25  A.       Whatever is in the contingency agreements.   Didn't

30

1    LeLiever give you those?

2    Q.    I am talking about Mr. Kovaleski and I am asking the

3    questions.

4    A.    Well, I don't have the fee arrangements in front of

5    me.

6    Q.    Why would it be that you would direct Mr. LeLiever to

7    make a payment of sum certain to Mr. Kovaleski?  Answer that.

8    A.    Because that would have been an amount that I would

9    have authorized pursuant to an agreement.

10    Q.    Why would it be that Mr. LeLiever would have to ask

11    you for Mr. Kovaleski's address, if Mr. Kovaleski worked for

12    Mr. LeLiever?

13    A.    Well, I don't know.  I don't know what you are

14    referring to.

15    Q.    Well, whether you know what I am referring to or not,

16    why would he have to ask you for Kovaleski's address?

17    A.    Once again, I can't answer that.

18    Q.    Did Mr. LeLiever introduce you to Mr. Kovaleski?

19    A.    I don't remember.

20    Q.    And do you remember where Mr. Kovaleski's office is?

21    A.    He is in Florida.

22    Q.    Did you introduce Mr. Kovaleski to Mr. LeLiever?

23    A.    I don't know about that.

24    Q.    Did you ever have a separate contract with Mr.

25    Kovaleski?

31

1    A.       What do you mean did I have a separate contract with

2    Mr. Kovaleski?

3    Q.       Did you have a contract with Mr. Kovaleski?

4    A.       I don't understand the question.  Yeah, there was a

5    contract in the contingency agreements.

6    Q.       Did you communicate with Mr. Kovaleski directly?

7    A.       Sometimes.

8    Q.       I would like to see that communication, please.

9    A.       I don't think I can recreate phone calls.

10    Q.       I would like to see all of your e-mail correspondence

11    with Don Kovaleski.  I am asking you –

12    A.       I don't have e-mail correspondence with him.

13    Q.       Really?

14    A.       Really.

15    Q.       Okay.  What about your phone records?  How about you

16    produce those and you show me where you had calls with Mr.

17    Kovaleski?

18    A.       Well, I mean, you are welcome to subpoena the AT&T

19    phone records if you would like.

20    Q.       Okay.  I am not subpoenaing the AT&T phone records.

21    I am asking you to provide me with your phone records to show

22    me where you talked with Mr. Kovaleski and on what dates.  And

23    I am also asking you to go back through your e-mails and print

24    out for me any e-mail correspondence between you and Mr.

25    Kovaleski.

32

1   A.      Go on.

2   Q.      Thank you. Did you supervise Mr. Kovaleski's work?

3   A.      No.

4   Q.      Did you review pleadings before they went to Mr.

5   LeLiever?

6   A.      I don't even know what that means.

7   Q.      Did you draft any complaints?

8   A.      I drafted some complaints that I filed.

9   Q.      Did you draft any complaints that Mr. LeLiever filed?

10  A.      No.  He is capable of doing his own work.

11  Q.      When Mr. Kovaleski did drafting, which I assume is

12  what he did, since you have indicated he was a paralegal, did

13  you review those documents before Mr. LeLiever saw them?

14  A.      Before LeLiever saw them, no.

15  Q.      So tell me how the arrangement worked then.

16  A.      What do you mean how the arrangement worked?

17  Q.      It was a three-party arrangement between you, and

18  Kovaleski and LeLiever.  I want to know how it worked.

19  A.      Kovaleski was a paralegal that Andrew used.  It's in

20  the contingency agreement.  He received a percentage of the

21  settlements or, if there was any judgments or whatever.

22  Q.      You had testified previously that LeLiever didn't set

23  off any fees against settlement proceeds.  Is that right?

24  A.      Not that I am aware of.

25  Q.      And it was your testimony that - so that wasn't your

34

1   Q.       Okay.  But I am not talking about what Mr. LeLiever

2   told you.

3   A.       Okay.  Well, I was just expanding on that question

4   but go ahead.

5   Q.       Did you consider filing lawsuits as your way of life?

6   Is that how you supported yourself?

7   A.       I received settlements from my lawsuits.

8   Q.       Is that the means that you used to support your

9   family, filing lawsuits?

10   A.       I am sorry.  I don't know exactly what you mean by

11   that.

12   Q.       Other than filing lawsuits and collecting settlement

13   proceeds, how have you supported your family and yourself?

14   A.       Well, that was the only income that I have.

15   Q.       Have you ever used an alias?

16   A.       No.

17   Q.       Who is Charlie Holmes?

18   A.       Charlie Holmes, that was a user name somehow linked

19   to yahoo on an e-mail account that was set up, I think, twelve

20   or thirteen years ago, and I tried to change that name to my

21   name and it wouldn't let me.

22   Q.       Did you use the name Charlie Holmes in any other

23   capacity?

24   A.       No.

25   Q.       Have you made any transfers to DOA Racing?

36

1    Q.     And you say here on leave.  Are you talking about

2    North Carolina or California?

3    A.     No, when he was in North Carolina.

4    Q.     When was he home on leave last in North Carolina when

5    he would have seen that amended complaint?

6    A.     It would have been in April, I believe.

7    Q.     Okay.  Mr. Jenkins, I am going to remind you that

8    your bankruptcy schedules and your statement of financial

9    affairs are documents that are filed under penalty of perjury.

10   They have to be complete.  They have to be accurate as of the

11   petition date.  It is not a best guess.  It is not your

12   decision as to what the law requires.  It is what the

13   bankruptcy petition, the bankruptcy code and the bankruptcy

14   rules call for.

15        Your bankruptcy papers are substantially incomplete.

16   I have highlighted some items that need to be updated, changed,

17   corrected or what have you while we have been talking today.

18   There are other items.  You need to go through your bankruptcy

19   papers very carefully, and I would urge you again - I know that

20   the trustee urged you, but I would urge you, as well, to seek

21   the assistance of an attorney in completing your bankruptcy

22   papers.  I understand you have had some law school training but

23   I assure you a bankruptcy petition is not something you want to

24   take chances with.

25   A.     No, I would love to have counsel, the help of

37

1   counsel.  Unfortunately I cannot afford any counsel and nobody

2   is willing to do it pro bono.

3   Q.        You can go to legal aid and talk with them about

4   that.

5   A.        I tried doing that.

6   Q.        Well, since you have relocated, you might want to try

7   it again.  I am not telling you what to do, I am telling you

8   that your papers are filed under penalty of perjury, and you

9   need to take extra care to be sure that they are correct.

10  A.        Okay.

11  Q.        I also need your wife's current address.

12  A.        (No response.)

13  Q.        Hello?

14  A.        Yeah, I am writing this down.

15  Q.        You don't know her address?

16  A.        I said I am writing this down.  You need my wife's

17  current address.

18  Q.        Can you give that to me today?

19  A.        No, I don't have it memorized.

20  Q.        And I need the addresses for your children, as well.

21  A.        Okay.

22  Q.        I have given you a list of things today while we have

23  been talking, and I would like to have those from you by a week

24  from today.  That would be July 26th.  Are you ready?

25  A.        Yeah, I am writing it down.