# EXHIBIT W

1

```
 1                    UNITED STATES BANKRUPTCY COURT
                     WESTERN DISTRICT OF NORTH CAROLINA
 2                           CHARLOTTE DIVISION

 3   IN RE:                          :    Case No. 12-50413

 4   MATTHEW ALAN JENKINS,           :    Chapter 7

 5       Debtor.                     :    Charlotte, North Carolina
                                          Monday, July 23, 2012
 6                                   :    2:03 p.m.

 7   : : : : : : : : : : : : : : : : : : : : : : : : : :

 8            TRANSCRIPT OF 2ND CONTINUED HEARING RE:
              (78) TRUSTEE'S MOTION FOR ORDER SETTING
 9            DATE FOR CONTINUED MEETING OF CREDITORS;
            (83) ANSWER AND OBJECTION TO THE EX PARTE
10              MOTION FOR ENTRY OF ORDER DIRECTING
             RULE 2004 EXAMINATION OF AND PRODUCTION OF
11          DOCUMENTS; AND (94) TRUSTEE'S REPLY THERETO
              BEFORE THE HONORABLE LAURA TURNER BEYER,
12                 UNITED STATES BANKRUPTCY JUDGE

13
     APPEARANCES:
14
     For the Bankruptcy              LINDA W. SIMPSON, ESQ.
15   Administrator:                  402 W. Trade Street, Suite 200
                                     Charlotte, NC  28202
16
     For James T. Ward, Sr.,         Grier Furr & Crisp, PA
17   Trustee:                        BY:  ANNA COTTEN WRIGHT, ESQ.
                                     101 N. Tryon Street, Suite 1240
18                                   Charlotte, NC  28246

19


20   Audio Operator:                 TARA SALMONS


21
     Transcript prepared by:         Janice Russell Transcripts
22                                   1133 Tanager Trail
                                     Virginia Beach, Virginia  23451
23                                   (757) 422-9089


24
     Proceedings recorded by electronic sound recording; transcript
25   produced by transcription service.
```

1       I will say this, as well: I know there's another
2  attorney that represented Mr. Jenkins, Mr. Norman. I work with
3  Mr. Norman. He's in a different county. I know the Trustee
4  didn't ask anything like this from Mr. Norman. She just asked
5  for, basically, his trust accounting and a few other things.
6  She's asked quite a bit from my office and it's taking me a lot
7  of time to try and find these documents and produce these
8  documents. These documents, a lot of them are almost a year
9  old or older. It's taken me quite a bit of time. I apologize
10 to the Court, but I have complied.
11      As far as -- with respect to Don Kovaleski, I think
12 Ms. Wright if she even asked Blake Norman, Mr. Kovaleski was
13 working with Mr. Norman in cases for Mr. Jenkins, which speaks
14 to the Court as far as when Mr. Kovaleski was hired, was hired
15 previous to my representation. I don't know when he was hired,
16 but, basically, I think Mr. Jenkins wanted him on the case.
17 Definitely, in my cases when I took the case he wanted me to
18 try and get him on. I don't, I didn't hire him for my firm,
19 but I put him in the contract and said, "Hey, if you want to
20 agree to paying this outside paralegal, you can. This is what
21 the outside paralegal wants to be paid."
22      As far as why I sent him the e-mail, I'll be honest,
23 Your Honor. I go to court. What I do is a lot of trial law.
24 So I sent him e-mails. I don't have -- it's just me and I
25 don't have a big office staff. So a lot of times I have to e-

1  sort of thing.  That, that's what he normally did when we had a
2  new complaint.  And by the way, it wasn't something that he
3  shopped around for new, for new people to, you know, new
4  clients.  These are all Matt Jenkins' cases.
5       So what would happen, you know, basically, Matt would
6  say, "Hey, I've been getting these calls."  Matt would tape his
7  calls.  In his house he'd have a recorder and then we'd go over
8  some of the recordings that he'd have.  It might be a year old,
9  or whatever, and we listened to them and see if we could piece
10 together who they were from and this and that.  Don Kovaleski
11 actually would help with finding out where the origin a lot, of
12 a lot of these numbers were from and then we could figure out
13 who the actual, who the defendant would be and then we'd
14 proceed with that and then we'd do a, maybe, demand letter.
15 Sometimes we just, you know, do a complaint from there.
16      But Don was very helpful in getting things prepared
17 and also, going forward with preparing, you know, drafts of
18 certain motions that I had him draft and get ready for certain
19 things.  All communication with any counsel or anything like
20 that was done by myself through e-mail and teleconference and I
21 had, you know, meetings with Judges and things like that coming
22 through the proceedings of a lot of these cases.
23      But Don, Don basically acted as a paralegal, but a
24 paralegal that was from Florida and to be honest with you, I
25 don't think he's ever even come to North Carolina.  He just

1  helped prepare documents and look at stuff online with this,
2  but I think that he had -- I don't know this -- but I think he
3  had a previous relationship with the debtor and the debtor
4  wanted to continue that relationship in our cases and the way
5  that I do it is it's 33-1/3 or it was 30 percent, depending on
6  the case, and that if he wants a little extra, then that's
7  what's written into the contract. And that's what it was,
8  that's what was done. He, he wanted Don to be part of the, the
9  case, so he ended up writing Don into the contract. So, well,
10 actually, I wrote him in, but basically, it was on -- he wanted
11 to have him around, so.
12         And as far as whether he paid Don or not, I think he
13 had a relationship with Don. He was in the contract, but he, I
14 think he enjoyed the fact of being able to give this guy a
15 check and that kind of thing. But I wrote him, the check to
16 Don, but I did as a, the general practice, I think, that I did
17 send them to, to Matt and Matt then disbursed the funds to, to
18 Don. Don knew -- I called him and he was, you know, I'd call
19 him a few times and he was absolutely fine with that.
20         But he works for a firm in Florida, the Owens Law
21 Firm, doing consumer protection down there and, you know, I've
22 talked to people in that firm and they think very highly of him
23 and, you know, I think he's new on that firm. He was with a, a
24 debt collection firm. So he was on the other side of the fence
25 for a while, but he's been working in consumer protection for