IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

---

In the matter of:                )
                                 )
MATTHEW A. JENKINS,              ) Case No. 12-50413
                                 )
    Debtor.                      )

---

JAMES T. WARD, Trustee,          )
    Plaintiff,                   )
v.                               ) Adv. No. 12-05033
DIANNA LEE JENKINS,              )
    Defendant.                   )

---

JAMES T. WARD, SR., et al.       )
    Plaintiffs,                  )
v.                               ) Adv. No. 12-03223
MATTHEW A. JENKINS,              )
    Defendant.                   )
                                 Charlotte, NC
                                 February 27, 2013, 11:01 a.m.

---

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE LAURA T. BEYER
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

A. Cotten Wright
Grier, Furr & Crisp P.A.
101 North Tryon Street
Suite 1240
Charlotte, NC 28246

Linda W. Simpson
Bankruptcy Administrator
402 W. Trade Street, Suite 200
Charlotte, NC 28202

---

ECRO Operator:                   Kim Towery

Transcriber:                     Patricia Basham
                                 6411 Quail Ridge Drive
                                 Bartlett, TN  38135
                                 901-372-0613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

2

1        (CALL TO ORDER)

2        THE COURT: All right.  We are here for the eleven

3   o'clock matters in the Jenkins case, the Ward versus Jenkins,

4   adversary proceeding 12-3223, as well as the continued pretrial

5   conference in the other Ward versus Jenkins, adversary 12-5033.

6   And I believe, by consent of the parties, the pretrial

7   conferences have been continued to March 13.

8        MS. WRIGHT: Your Honor, it is not clear to me whether

9   both the pretrial conferences were continued or just the one in

10  the case where Ms. Simpson and I have sued the debtor.  With

11  respect to the 12-5033, I believe it is, that is Ms. Jenkins.

12        THE COURT: Right.

13        MS. WRIGHT:  The court's summary judgment, order and

14  judgment is on appeal and there is one remaining issue and that

15  is insolvency to be decided by the court.  I am wondering if we

16  could not just somehow put that one on hold until we have a

17  decision in the appeal.  I mean, it just seems – we may not

18  need to go forward with proving up insolvency.

19        THE COURT: Right.  I guess the only other question I

20  have is – and I did not see the chain of e-mails, so I don't

21  know whether or not it was their intention for that one to be

22  continued to March 13 or not.

23        MS. WRIGHT:  That's right and, as I recall the chain

24  of e-mails, it was about this case but, as just a caution, it

25  might be better to continue both of them.

3

1        THE COURT: I think that's what we will do.  Out of an

2   abundance of caution, I will continue the pretrial conference

3   in the adversary proceeding 12-5033 until March 13.   Having

4   said that, I don't disagree with what you suggested, Ms.

5   Wright, so in all likelihood, that is exactly what will happen

6   that day.

7        MS. WRIGHT:   Okay.  Thank you, Your Honor.

8        THE COURT: You are welcome.  So that otherwise leaves

9   us – now, the other pretrial conference was consensually

10  continued to March 13, so that leaves us with the hearing on

11  the plaintiff's motion for summary judgment, and I will note

12  for the record that Mr. Jenkins is not present in the courtroom

13  today for the hearing.

14        So, all right.

15        MS. WRIGHT:   Thank you, Your Honor, and I apologize,

16  I didn't introduce myself and I didn't introduce Mr. Ward.

17        THE COURT: I didn't give you a second to.  I probably

18  cut you off.  Go ahead.

19        MS. WRIGHT:   Cotten Wright, Grier, Furr & Crisp, here

20  on behalf of the trustee, Mr. Ward, and Mr. Ward is with me in

21  the courtroom.

22        MS. SIMPSON: Linda Simpson, Bankruptcy Administrator.

23        THE COURT: Okay.

24        MS. WRIGHT:   Your Honor, this is the motion by the

25  plaintiffs for summary judgment in the discharge adversary

4

1    proceeding that we brought against Mr. Jenkins.  We filed our

2    motion for summary judgment on January 22nd and the debtor

3    responded and we filed a reply brief.

4         The debtor's response raised an issue about the

5    timeliness of the complaint.  I think we probably need to deal

6    with that before we go any further.  He questioned the

7    timeliness of the complaint.  First of all, he questioned the

8    court's authority to extend the deadline to object to

9    discharge.  He cites to the wrong rule.  He cites to the rule

10   with respect to 523 actions and objections to discharge rather

11   than Rule 4004 which clearly allows bankruptcy judges to enter

12   orders extending a deadline to object to discharge.

13        In this case, on July 2nd, the court had ordered the

14   debtor to appear at a continued meeting of creditors and also,

15   on July 2nd, the court entered an order extending the deadline

16   to sixty days after the meeting of creditors has been adjourned

17   and that's a quote, has been adjourned.

18        When the debtor didn't appear on July 11th for a

19   continued meeting of creditors, the court will recall that he

20   was found in contempt but permitted to purge that contempt by

21   appearing at a subsequent date and the debtor did appear for a

22   continued creditors meeting on July 19, 2012.

23        In his objection, the debtor argues that the

24   plaintiffs were required to seek an additional extension after

25   the second meeting of creditors.  We believe he is wrong about

5

1   that because we stated on the record that we were not

2   concluding the meeting on July 19th and that I was going to –

3   I stated on the record that I was going to be speaking with the

4   trustee and, if the trustee determines we can adjourn the

5   meeting, we will file a notice of that but officially the

6   meeting was continued, and we have submitted a page from that

7   transcript with our reply.

8        Also on July 19th, I sent to Mr. Badger an e-mail

9   noting that the creditors meeting and unfortunately I left out

10  a word, was not adjourned.  I left out the word "not," but I

11  believe the context is clear because it continued to say but

12  rather continued pending Mr. Jenkins' production of the

13  requested documents and the trustee's decision to adjourn the

14  meeting.

15       There has never been anything posted on the docket

16  saying that the meeting has been concluded, the creditors

17  meeting has been concluded or adjourned or anything of that

18  nature.

19       Now, on August 7, 2012, I did report on the record

20  that the debtor had substantially complied with the court's

21  order to appear at the continued creditors meeting but that

22  text entry doesn't reference an adjournment; it doesn't

23  reference a conclusion and in fact it was neither.  It does not

24  state that.

25       So as of the date of the complaint, September 26,

6

1    2012, there had been no entry on the docket, no notice to the

2    debtor that the creditors meeting had been closed out and so

3    therefore the sixty-day period provided for in the court's July

4    2nd order had not run as of the date that this adversary

5    proceeding was filed, and we believe that the complaint was

6    timely.

7         THE COURT: And I will cut you off, Ms. Wright, there,

8    too, and agree with you.  I did review, and I did not say this

9    earlier, your, the plaintiffs, both plaintiffs' brief in

10   support of the motion for summary judgment, as well as the

11   debtor's opposition to the trustee's motion and then again the

12   plaintiff's reply to the debtor's opposition.  I did note in

13   the debtor's opposition that he had raised that issue, which

14   frankly gave me some concern when I saw that.  I went back

15   through the record, just as you did, and then I saw that in

16   your reply; but I agree with what you just said.  I believe

17   that the trustee's complaint was timely filed.

18        First of all, clearly the court had the authority to

19   extend the deadline to object to dischargeability and discharge

20   under Rule 4004.  The court did in fact enter an order on July

21   2nd extending the deadline to object to dischargeability until

22   sixty days after the 341 meeting is adjourned.  As you said,

23   that was the language from the order.

24        And I will note for the record, just as the debtor is

25   not here today to defend against this motion for summary

7

1    judgment, and I went back and reviewed the docket, the debtor

2    did not respond to the trustee's motion to extend that deadline

3    and raised no objection to it, and the order was entered and it

4    says what it says.

5         Then the debtor failed – you know, the debtor in part

6    created this mess by failing to appear at the 341 meetings.

7    Then we had the continued 341 on July 19th, at which the debtor

8    appeared by phone.  I reviewed the transcript and your reply

9    and it specifically provided that the meeting was continued and

10   not adjourned and it would be pending basically the trustee's

11   decision as to adjourning that meeting.

12        In any event, the complaint was filed on September 26th

13   and at which point the 341 meeting still was not adjourned.  So

14   I think that the complaint was, and I find that the complaint

15   was timely filed but I do agree with you, I think that's a

16   point that needed to be addressed at the outset.

17        So with that, we can turn our attention to the

18   underlying motion for summary judgment.

19        MS. WRIGHT:   Thank you, Your Honor.  I appreciate

20   that.

21        Turning to the substance of the motion, we believe

22   that the debtor's bankruptcy papers are substantially

23   incomplete even though they have been amended multiple times.

24   For one thing, they don't disclose transfers of the debtor's

25   property that occurred within two years of the petition date.

8

1    Those transfers are well documented in the documents that we

2    have and actually admitted to by both the debtor and the

3    transferee, his wife, Dianna Jenkins.

4         The debtor has admitted to transferring those funds

5    also within one year of the bankruptcy filing and subsequent to

6    entry of judgment against him by Federated Financial – on

7    behalf of Federated Financial Corporation of America.  And so

8    we think that his actions, when layered against the transfers

9    and what was going on in the Federated matter, clearly show at

10    least an intent to delay, if not hinder and defraud,

11    Federated's collection efforts.

12         And alternatively we have also brought a claim with

13    respect to the debtor's failure to provide records with respect

14    to his assets and his lawsuits that he listed, potential

15    lawsuits that he listed on his bankruptcy papers.  And of

16    course entry of judgment in favor of the plaintiffs as to any

17    one of those claims will completely resolve this discharge

18    proceeding.

19         Just going back over the facts briefly, outside of the

20    two-year window prepetition, we see that on March 16, 2010,

21    Federated Financial Corporation of America was awarded judgment

22    against the debtor in Wake County Superior Court and we have

23    attached a copy of that judgment to our brief.

24         On March 31, the debtor filed a motion to set aside

25    that judgment.

9

1          Within the two-year window prepetition, on June 29th,

2     the trial court in the Federated matter denied the debtor's

3     motion to set aside and, a month later, July 28th, the debtor

4     filed an appeal with respect to that order by the trial court.

5          On December 1st, the debtor agreed to pay Mr. LeLiever,

6     his prepetition litigation attorney, a flat fee of twenty-five

7     thousand dollars to pursue an appeal of the Federated judgment.

8     On February 25, 2011, the debtor was ordered to produce

9     documents to Federated relative to the debtor's assets and,

10    again, all of these appear as exhibits to either our brief or

11    our reply brief.

12         April 1, 2011, the debtor signed another flat free

13    agreement with Mr. LeLiever agreeing to pay him an additional

14    fifteen thousand dollars to pursue an appeal of the order

15    requiring the debtor to turn over documents relating to his

16    assets.

17         Within one year of the petition date – and during that

18    period, Your Honor – I will go back a step – during that period

19    there were transfers, regular transfers to Dianna Jenkins of

20    any lawsuit proceeds that the debtor was awarded in his

21    litigations, various litigation matters.

22         On September 6, 2011, the North Carolina Court of

23    Appeals issued its opinion affirming the denial of a motion to

24    set aside the Federated judgment.

25         February 21st, just a couple weeks later, the debtor

10

1    filed a complaint against Federated in the United States

2    District Court alleging that Federated and its lawyer had

3    violated consumer protection statutes.   A copy of that

4    complaint was attached to our reply brief.

5         On January 17, 2012, the Court of Appeals affirmed the

6    order requiring the debtor to produce documents.  And on April

7    10, 2012, Judge Stephens of the Wake County Superior Court

8    entered an order requiring the debtor to appear before the

9    court on April 12 and bring with him – this is a quote – "bring

10   with him all records from his wife's bank account and any other

11   bank account he has deposited funds to since January 1, 2008,"

12   end quote, and that is Exhibit "B" to our brief.

13        The debtor testified at the 341 meeting on May 14th

14   that his lawyer, Mr. LeLiever, offered a payment plan to

15   Federated's attorney, Jon Player, on April 10th, the same day

16   as the entry of Judge Stephens' order, and with the

17   accompanying promise that the debtor would file bankruptcy if

18   Federated refused to agree to a payment plan.

19        Now, both the debtor and Mr. LeLiever have filed

20   declarations or at least the debtor has attached declarations

21   to his reply or response, rather, stating that the debtor did

22   intend to pay Federated and that LeLiever had made numerous

23   offers to Federated through its attorney, Jon Player.

24        I would note for the court that Jon Player didn't

25   become involved with the Federated matter until after September

11

1   21, 2011, when the debtor sued Federated in the United States

2   District Court.   Mr. Player represented Federated in that

3   action.

4        So it was at least a year and a half after entry of

5   the Federated judgment that any approach, from what we can

6   tell, any approach would have been made to Federated with

7   respect to a payment plan.

8        Now, we don't have any documentation of these

9   representations of a payment plan.  We have no e-mails.  We

10  have no letters.   We have no copies of checks that were

11  tendered and returned.   We have nothing other than Mr.

12  Leliever's statement that he had offered a payment plan to Jon

13  Player and the debtor's statement that numerous offers had been

14  made to Federated of a payment plan.

15       So on April 11 of 2012, the debtor filed his bare

16  bones petition.  Now, we have attached our Exhibit "P" to our

17  brief which it is a spreadsheet that was created by my firm

18  that shows that, throughout the two years before the petition

19  date, the debtor was transferring funds to Dianna Jenkins and,

20  as a matter of fact, he transferred more than two hundred and

21  twenty thousand dollars and he has admitted that those deposits

22  went to Dianna Jenkins' bank accounts.

23       In the year before the petition date, the transfers by

24  our calculations, based on review of Ms. Jenkins' bank

25  statements from both of her accounts, as well as review of

1    information obtained from Mr. LeLiever and Mr. Norman, the

2    debtor's other prepetition litigation lawyer, we believe that

3    the transfers in the year before the petition date total sixty-

4    four thousand, five hundred and sixty-six dollars.

5           After the petition date, the debtor instructed Mr.

6    LeLiever to transfer to Dianna Jenkins seven hundred and

7    fifteen dollars and seventy cents that was remaining in Mr.

8    LeLiever's trust account.  In fact, Mr. LeLiever did cut a

9    check to Dianna Jenkins for that.  So there was a post-petition

10   transfer.

11          On April 24, 2012, the debtor filed his bankruptcy

12   papers.  In those bankruptcy papers, he scheduled a claim for

13   Federated at forty thousand dollars, as well as claims from the

14   IRS and the North Carolina Department of Revenue.

15          In his statement of financial affairs, the debtor

16   indicated that he had received no income from employment in the

17   two years before the petition date but that he had received two

18   hundred and thirty-five thousand, two hundred and seventy-eight

19   dollars in lawsuit proceeds within that time frame.  None of

20   the debtor's prepetition transfers to his wife are listed on

21   the debtor's statement of financial affairs.  No transfers to

22   any third parties were listed on the debtor's statement of

23   financial affairs.  No payments to creditors were disclosed

24   within the ninety days before the petition date, although

25   LeLiever's trust records show that payments of four thousand,

13

1   six hundred and forty dollars and three thousand, two hundred

2   and twenty-five dollars respectively were made to LeLiever and

3   Don Kovaleski, the paralegal, during that ninety-day period.

4       The debtor's schedules don't indicate that he held any

5   interest in any checking accounts or any funds held in Dianna

6   Jenkins' checking accounts for the debtor's benefit, and the

7   debtor's schedules also don't reflect any kind of household

8   creditors or the kinds of things that we would – the kind of

9   obligations that we would normally see on a consumer debtor's

10  bankruptcy papers.

11      On April 30, 2012, the debtor amended his papers.  He

12  added to Schedule-F a claim for Mr. LeLiever in the amount of

13  ninety-seven thousand, five hundred dollars.  He also scheduled

14  five thousand dollars in lawsuit proceeds on his Schedule-B

15  that were being held by LeLiever and claimed an exemption in

16  those funds in an amended Schedule-C.

17      Meanwhile, in compliance with this court's orders, Ms.

18  Jenkins turned over bank statements for her accounts at BB&T

19  and Wells Fargo Bank and, along the way, we received

20  documentation from Mr. LeLiever as to various settlements of

21  the debtor's lawsuits, records on Mr. LeLiever's trust accounts

22  and copies of checks issued to Dianna Jenkins for lawsuit

23  proceeds.  We also obtained records from Mr. Blake Norman on

24  his trust account relative to disbursement of lawsuit proceeds.

25      On May 14, 2012, the debtor testified at his first

14

1    meeting of creditors that his lawsuit proceeds were deposited

2    to his wife's bank account.

3         On July 19, 2012, during the continued meeting of

4    creditors, the debtor testified that he had not disclosed the

5    account at BB&T to which most of the lawsuit proceeds have been

6    deposited because that account, quote/unquote, doesn't belong

7    to him and that he is, quote, just an authorized user, end

8    quote.

9         The debtor testified that he had access to the funds

10   transferred to Dianna Jenkins' Wells Fargo account through

11   permissive use of her ATM card and that he wrote checks on the

12   BB&T account and made withdrawals from that account.

13        The debtor also testified that he directed LeLiever to

14   transfer the funds remaining in LeLiever's trust account post-

15   petition to Dianna Jenkins after the petition date.

16        On   July   24,   2012,   Dianna   Jenkins   e-mailed

17   correspondence from BB&T to me confirming that the debtor was

18   in fact an authorized user and not an account owner of Ms.

19   Jenkins' account at BB&T.

20        On July 25, in response to a request made at the

21   continued creditors meeting, the debtor e-mailed a summary of

22   his net lawsuit proceeds and showed a total of two hundred and

23   twenty-six thousand, thirty-one dollars and thirty-three cents.

24        The debtor stated that the transfers to Dianna Jenkins

25   did not reflect any payment, quote, for any goods or services,

15

1    end quote, or for any extensions of credit or money loaned.  In

2    other words, those transfers were made without consideration.

3          Instead, the debtor alleged the transfers to Dianna

4    Jenkins were merely a conduit to deposit funds to the marital

5    account and that he did not lose ownership of the lawsuit

6    proceeds that were transferred.

7          On August 29, 2012, Dianna Jenkins sent the trustee's

8    lawyer an e-mail stating that, quote, "It was Mr. Jenkins, not

9    me, who spent his proceeds by writing checks and making ATM

10   withdrawals as the bank record shows."

11         Ms. Jenkins also denied being a recipient of any

12   transfer.

13         Now, this statement of Ms. Jenkins is contradicted by

14   a review of Ms. Jenkins' bank statements.  We haven't raised

15   this in our papers but the bank statements that were filed with

16   our brief on the BB&T account shows that a deposit of lawsuit

17   proceeds would be made and they would be immediately followed

18   with online payments to Duke Energy, Chase Credit Card, Time

19   Warner Cable and the like.

20         Now, Mr. Jenkins has told us on his bankruptcy papers

21   he is not responsible for those kinds of household obligations,

22   but those obligations were being paid immediately after a

23   deposit of lawsuit proceeds.  So whether Ms. Jenkins did or did

24   not spend any of the lawsuit proceeds, that's not really at

25   issue here.

1          On September 14, 2012, the debtor amended his

2    bankruptcy papers again and he reduced the claim scheduled for

3    Mr. LeLiever to fifty-six thousand, five hundred dollars.  He

4    also reduced the amount of lawsuit proceeds that he had

5    received on his SOFA to that two hundred and twenty-six

6    thousand dollar figure that he had given to me several weeks

7    earlier.

8          On October 19, 2012, the debtor amended his papers

9    again and this time he disclosed the seven hundred and fifteen

10   dollars and seventy cents that was being held by Mr. Leliever

11   as of the petition date that was transferred post-petition.

12         So despite the debtor's three amendments to his

13   bankruptcy papers, he didn't disclose any transfers of the

14   lawsuit proceeds to Dianna Jenkins; he didn't disclose any

15   transfer of lawsuit proceeds to anybody.  He didn't disclose

16   any interest in funds held in Dianna Jenkins' bank account or

17   any payments to creditors that may have been made in the ninety

18   days before the petition date or any payments or transfers at

19   all that were made outside the ordinary course of business.  He

20   didn't disclose professional fees paid to LeLiever and

21   Kovaleski, in particular, and we know that those payments were

22   made in the ninety days before the petition date.  It didn't

23   list any household creditors and the like.

24         Now, the version of the facts recited by the debtor

25   are a matter of record both in this case and in the Federated

1    matter but the debtor has attempted to raise a dispute as to

2    certain facts that are on the record.

3         In the debtor's response to facts filed with his

4    objection, he denies transferring funds to his wife.  He denies

5    that his bankruptcy papers are substantially incomplete.  He

6    denies that he failed to keep records relevant to his assets,

7    liabilities or financial condition, and he denies and disputes

8    that he did not attempt to satisfy the Federated judgment.

9         In his objection, he states that he deposited his

10    lawsuit proceeds to his wife's account in the ordinary course

11    of business.  He argues that the transfers to his wife were

12    not, quote, absolute, end quote, because he maintained control

13    over those funds.

14         The debtor states that he had spent all of the lawsuit

15    proceeds by the time of the petition date.  He also

16    recharacterizes his testimony at the May 14, 2012, meeting of

17    creditors, arguing that what he really meant to say was that he

18    only had one creditor.

19         Now, that's understandable.  Sometimes one says

20    something that comes out differently, appears differently than

21    what one meant when it is printed on a transcript but, at any

22    rate, the quote that we put in our papers was accurate based on

23    the transcript.

24         The debtor also argues that LeLiever and Kovaleski

25    were not creditors because they received contemporaneous

18

1    payments, so he didn't have to make those disclosures of

2    payments of fees.

3         Your Honor, those are the facts.  We have got three

4    causes of action.  We think two of them are equally strong and

5    I will go through those two first and then we will talk about

6    the third.

7         The application of the law to the material

8    uncontroverted facts that are shown in the record and papers

9    that we filed with our brief and our reply brief show that the

10   debtor's discharge should be denied pursuant to 727(a)(2)

11   because the debtor, with intent to hinder and delay or defraud

12   a creditor of the estate, has transferred, removed, destroyed,

13   mutilated or concealed or has permitted to be transferred,

14   removed, destroyed, mutilated or concealed property of the

15   debtor within one year before the date of the petition and, in

16   this case, property of the debtor after the date of the filing

17   of the petition.

18        The elements that have to be established pursuant to

19   727(a)(2)(A) are that, within one year of the petition date,

20   the debtor transferred or concealed the debtor's property with

21   intent within a year before the date of the petition.

22        The elements that have to be shown with respect to

23   727(a)(2)(B) are substantially the same except that we have to

24   show a transfer after the petition date.

25        Now, the debtor has denied that any, quote, transfers

1    of his lawsuit proceeds were made to Dianna Jenkins but the

2    documentary evidence is overwhelming in the other direction.

3    The debtor has admitted that the lawsuit proceeds were

4    deposited to his wife's bank accounts both before and after the

5    petition date.  The documentary evidence shows that the debtor

6    wasn't an owner of either one of those accounts, and the

7    definition of the term "transfer" was specifically drafted so

8    as to include deposits to bank accounts.  We have talked about

9    that earlier, I believe in Dianna Jenkins' bankruptcy case, and

10   we have cited to the legislative history in our papers.

11        The debtor bases his argument that no transfers were

12   made on the fact that he continued to have access to and to

13   spend the lawsuit proceeds but, because title to the lawsuit

14   proceeds was in fact transferred to Dianna Jenkins' name when

15   the checks for those funds were made payable to her and

16   deposited to her bank accounts, the transfers were absolute.

17   The admission that the debtor continued to have access to the

18   funds supports the conclusions that the transfers were in fact

19   fraudulent.

20        For these reasons, the debtor's argument that the

21   checks made payable to and deposited to Dianna Jenkins' bank

22   accounts were not transfers fails.

23        The debtor has not argued that the lawsuit proceeds

24   did not reflect his property, so we have met that element of

25   the statute.

1          As for the fourth element under (a)(2)(A), the

2     documentary evidence shows again that there was in excess of

3     sixty-four thousand dollars transferred to Dianna Jenkins

4     before the petition date and, with respect to (a)(2)(B), that

5     there was seven hundred and fifteen dollars transferred after

6     the petition date.

7          The third element, the element of intent is where the

8     debtor has raised the biggest argument in his response.  He

9     denies he had any such intent to hinder, delay or defraud

10    Federated and he again attached a couple of affidavits, one

11    from himself and one from Mr. LeLiever, as proof of that.

12         The court, of course, has to weigh that evidence in

13    those affidavits that, again, are unsupported, against the

14    analysis of the badges of fraud as reflected in the debtor's

15    actual behavior.

16         As explained by the Fourth Circuit, the court is

17    permitted to draw inferences from the application of the badges

18    of fraud to the facts and circumstances of the debtor's case.

19    There are seven badges that have been laid out by the Middle

20    District Bankruptcy Court in the *Arnold* case and those include

21    a family relationship; the debtor's retention of benefit or use

22    of the property; the lack or inadequacy of consideration; the

23    debtor's financial condition before and after the transfer; the

24    existence of a cumulative effect of the pattern or series of

25    transactions or course of conduct after incurring the debt or

1   the onset of financial difficulties or the pendency of a suit;

2   the general chronology of the events and transactions under

3   inquiry; the debtor's attempt to keep the transfer a secret;

4   and the proximity of the transfer to the debtor's bankruptcy

5   filing.

6        Of course, 727(a)(2) is phrased in the disjunctive, so

7   we need to either show an intent either to hinder, or delay, or

8   defraud.  We don't have to show all three.  But application of

9   the badges of fraud here clearly weighs in favor of denial of

10   discharge.   The debtor has acknowledged that his lawsuit

11   proceeds were deposited to his wife's checking account. He has

12   stated affirmatively that he continued to access the lawsuit

13   proceeds after those transfers were made.   He has stated

14   affirmatively that the transfers were not made for any

15   consideration.

16        The lawsuit proceeds totaling sixty-four thousand,

17   five hundred and sixty-six dollars were transferred within a

18   year and again – I will get to that later.   The general

19   chronology of events and transactions shows that, during the

20   year before the petition date, the debtor resisted Federated's

21   discovery efforts and that he actually challenged Federated's

22   collection efforts by filing the lawsuit against them in the

23   United States District Court.

24        The debtor did not produce Dianna Jenkins' bank

25   statements to Federated.   Instead he filed bankruptcy after

1 being ordered to produce those bank statements to Federated.

2 The debtor refused to disclose the transfers in his

3 bankruptcy papers after he had filed bankruptcy and the

4 prepetition transfers to Dianna Jenkins continued until about

5 two weeks before the petition date and, after the petition,

6 there was that one transfer of seven hundred and fifteen

7 dollars.

8 In sum, analysis of the badges of fraud substantially

9 outweighs the unsupported affidavits by LeLiever and the

10 debtor.   When you layer the debtor's actions before the

11 petition date against the record of the transfers that were

12 made to Dianna Jenkins and the fact that the debtor has

13 acknowledged that he continued to have access to those funds,

14 it clearly shows an intent, we believe, to defraud.  But if

15 nothing else, the debtor's actions show an intent to at least

16 delay Federated's collection efforts by not producing records,

17 appealing the order that required him to produce records, not

18 showing up for court on April 10th before Judge Stephens and

19 then being ordered to appear on April 12th to produce his

20 records.  He obviously was playing a game of delay.  The fact

21 that he sued Federated and its lawyers in September 2011 shows,

22 we believe, an intent to hinder their collection efforts.

23 So for all of these reasons, we would ask that the

24 court enter summary judgment as to our claims pursuant to

25 727(a)(2).

1    We will go on now to our claims pursuant to 727(a)(4)

2    based on false oaths.  That section of the code provides that

3    a bankruptcy discharge will be denied if the debtor knowingly

4    and fraudulently or in connection with a case made a false oath

5    or account.  Essentially this code section codifies the

6    principle that only the honest but unfortunate debtor is

7    entitled to a fresh start as provided through the bankruptcy

8    discharge.

9    The debtor's petitions, his schedules, his SOFA, and

10   all of the amendments thereto were executed under oath.  The

11   bankruptcy code, the bankruptcy rules, the bankruptcy forms are

12   designed to ensure that complete, truthful and reliable

13   information is put forward at the outset of the proceedings so

14   that the decisions can be made by the parties-in-interest based

15   on fact rather than on fiction.

16   The trustee and the debtor's creditors are not

17   required to engage in a tug-of-war with the debtor in order to

18   pull the information out.  Although the Fourth Circuit has

19   stated that a false oath must be related to a matter that is

20   material in the debtor's case, the debtor's failure to disclose

21   assets or transactions in the debtor's schedules or SOFA may be

22   sufficiently material so as to warrant denial of discharge.

23   Therefore, if the debtor's schedules and SOFA as filed

24   contain materially incorrect information, discharge should be

25   denied; and even a debtor's subsequent disclosure does not

1    expunge a prior false oath.

2          In this case, the most glaring admission from the

3    debtor's bankruptcy papers and amended bankruptcy papers was

4    his failure to disclose the transfers to Dianna Jenkins and he

5    hasn't just failed to do that, he has refused to do that.

6          The debtor has justified not disclosing those

7    transfers because he didn't pay Dianna Jenkins for goods or

8    services or for an extension of credit or money loaned,

9    therefore no payments were made to her.

10          The debtor has also alleged that those transfers were

11    made in the ordinary course of his financial affairs, and he

12    has contradicted himself by saying he was not required to

13    disclose any interest in the BB&T account because he is not an

14    owner of that account but, on the other hand, he stated that he

15    did not lose ownership or interest in the funds that were

16    transferred to Dianna Jenkins.

17          The debtor hasn't given us enough information for us

18    to be able to discern what his ordinary course of business

19    actually is.  Again, he doesn't list any of the typical types

20    of creditors that would be found on a consumer debtor's

21    petition.  So we have to assume that he doesn't have any of

22    those types of liabilities.

23          Moreover, the debtor and his wife have stated

24    affirmatively that the debtor spent his lawsuit proceeds

25    leading to the inference that the transfers to Dianna Jenkins'

1  bank accounts were not made for the purpose of paying household

2  expenses, although we can't be sure.

3       In any event, the debtor's amended bankruptcy papers

4  don't disclose the transfers or the debtor's continued

5  ownership in the funds and, even if we accept the debtor's

6  argument that he was not required to disclose those transfers,

7  there were no transfers to third-parties of those lawsuit

8  proceeds disclosed on the SOFA.

9       Further, among the other admissions is that the debtor

10  only listed selected creditors and those were again Federated,

11  IRS, the NC Department of Revenue and Mr. LeLiever.

12       Even though the term creditor is broadly defined, the

13  debtor has assumed that he did not need to disclose payments to

14  his legal professionals because, in the debtor's world, those

15  were contemporaneous payments and he has raised the same

16  argument with respect to utility providers and the like.

17       The debtor's multiple amendments didn't change

18  anything.  Each time he signed and filed papers with the

19  bankruptcy court, he did so under oath and each time he did so,

20  he left out material omissions, so each filing reflected a

21  false oath.  We know that those false oaths were not

22  inadvertent because he has told us, he has argued with us about

23  what he has to provide, what information he has to file.  There

24  is nothing in the law that requires the trustee to chase down

25  a debtor and make sure that his papers are correct.

1    He has disregarded the warnings that he has received

2    both from the trustee at the May 14, 2011, creditors meeting

3    and from me at the July 19th continued creditors meeting and in

4    an e-mail that I sent to the debtor.  The debtor simply knows

5    better than we do as to what is required.

6    Viewed through the lens of the debtor's history of

7    resistance to producing any financial records to Federated

8    post-petition, his – prepetition, excuse me – his post-petition

9    refusal to disclose the transfers and payments to creditors and

10   the like reflected in our view an intent to deceive by

11   withholding material information regarding his financial

12   affairs and, in particular, the disposition of his lawsuit

13   proceeds.

14   So for those reasons, we would ask that the court

15   enter summary judgment with respect to our claim pursuant to

16   727(a)(4).

17   We have a third claim, Your Honor, under 727(a)(3) and

18   this is a failure to produce records.  Reading the statute, it

19   appears that a debtor is required to turn over any – rather

20   keep and preserve and turn over any recorded information.

21   Typically we will acknowledge that the way that has been

22   interpreted is that a debtor has to turn over books and

23   records, financial books and records, accounting statements and

24   that sort of thing.

25   In this case, what the debtor didn't turn over to us

27

1    were records related to the potential causes of action that he

2    listed in his petition and, as a matter of fact, because we

3    didn't have sufficient information, we came to the court and

4    got an order preserving those causes of action for the benefit

5    of the bankruptcy estate should the debtor decide to pursue

6    them after his case has been closed.

7         We believe that the statute would extend to cover a

8    failure to produce the types of records that relate to his

9    assets that we have requested but, again, our request under

10   727(a)(3)is an alternative request and we would ask that the

11   court enter judgment on that, as well.

12        Thank you.

13        THE COURT: All right.  Ms. Simpson.

14        MS. SIMPSON: The only thing that I would just like to

15   add to that is somewhat a characterization of this debtor.

16   This is a *pro se* debtor and at times we are all sympathetic to

17   *pro se* debtors because they are unsophisticated parties.  Mr.

18   Jenkins  has  proven  before  the  court  he  is  not  an

19   unsophisticated party.  He has made his living in the past by

20   filing lawsuits and appeals in the state and federal courts.

21   He  has  in  fact  filed  *pro se* documents  that  evidence  a

22   familiarity with the law and being able to read the law and

23   read the cases and have responsibilities under that.  So I

24   don't believe this is a case of an unsophisticated debtor.

25        In fact, there are other things that on the record

1    show Mr. Jenkins has potentially abused the system in other

2    ways.  As I think Your Honor will recall, there was a

3    presumption of abuse from the means test filed in court. Mr.

4    LeLiever as creditor of the debtor, the debtor's attorney and

5    his creditor, filed a motion to dismiss as the case was an

6    abusive filing and Mr. Jenkins also, *pro se*, filed a motion to

7    dismiss the case as abusive.

8        It appears, from all of his actions historically and

9    in this case, his purpose is to delay, hinder and defraud.  So

10    I think Your Honor can look at what happened in the base case

11    also in support of these motions.

12        THE COURT: And I will say I agree wholeheartedly with

13    everything that you just said, Ms. Simpson, and I won't

14    reiterate all of it but, again, I will start by saying that the

15    debtor is, once again, not here today to defend against the

16    motion for summary judgment.  I did review the plaintiff's

17    brief, the debtor's opposition, as well as the plaintiff's

18    reply to the debtor's opposition.  The plaintiff, as stated by

19    Ms. Wright, has moved for summary judgment with respect to all

20    three causes of action in the complaint under 727(a)(2),

21    727(a)(3) and then 727(a)(4).

22        As set out by Ms. Wright, summary judgment for the

23    moving party is appropriate when there are no genuine issues of

24    material fact and the moving party is entitled to judgment as

25    a matter of law.  And I find in this case it appears that there

1    are  no  genuine  issues  of  material  fact  and  that  summary

2    judgment is in fact appropriate on all three causes of action

3    for  all  of  the  reasons  stated  in  the  briefs  and  supporting

4    documents that were filed by the plaintiffs.  And I think that

5    that has all been set out in great detail in the plaintiff's

6    supporting documents, as well as the exhibits and affidavits

7    that were attached, and frankly there is no reason for me to go

8    back and reiterate all that you just said, Ms. Wright, but for

9    all of those reasons I will grant summary judgment in favor of

10   the plaintiffs and will ask you, Ms. Wright, if you would draw

11   an order and I think it should be perfectly consistent with the

12   briefs that you have already filed but if you would draw that

13   order.  I don't know if you need to circulate that by Ms.

14   Simpson  but  then  upload  that  for  my  signature,  I  would

15   appreciate it.

16          So I think that is it.  I know this has been a lot of

17   work for you, Ms. Wright, and Mr. Ward, and I appreciate it.

18          MS. WRIGHT: Thank you, Your Honor.

19          COURTROOM  DEPUTY:  Does  this  moot  the  need  for  a

20   pretrial conference?

21          THE COURT: That will enter judgment in favor of the

22   plaintiff  and  it  will  moot  the  need  for  that  pretrial

23   conference on March 13th, yes.  We will otherwise have the

24   continued  pretrial  conference  in  the  other  adversary

25   proceeding, though, and we will –

30

1          MS. WRIGHT:   Your Honor, do you want me to include

2      that in the order?  That the need for a pretrial conference is

3      mooted?

4          THE COURT: Yes.  You know, since we have granted

5      summary judgment, there is no reason to conduct a pretrial

6      conference.

7          COURTROOM DEPUTY: And what time would you like the

8      hearing to be in the other case?

9          THE COURT: 9:30 would be fine.

10         Thank you.

11         MS. WRIGHT:   Thank you, Your Honor.

12         (Off the record at 11:45 a.m.)

31

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

 /s/ Patricia Basham
Patricia Basham, Transcriber
Date:  April 3, 2013